**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ATD-AMERICAN CO., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KRUEGER INTERNATIONAL, INC., | : | NO.  12-00032 |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                April 19 , 2012

Presently pending before the Court are Defendant Krueger International, Inc.'s Motions to

Dismiss Pursuant to Federal Rule of Procedure 12(b)(6), to Strike Pursuant to Rule 12(f), and for

a More Definite Statement Under Rule 12(e).  For the following reasons, the Motions are granted

in part and denied in part as set forth in the accompanying Order.

## I.    FACTUAL AND PROCEDURAL HISTORY[1]

Plaintiff ATD-American Co. ("Plaintiff"), a Pennsylvania corporation, sells furniture and

other supplies to a variety of institutions via direct marketing, catalog sales, and internet sales.

(Compl. #1 ¶¶ 1, 7.)  Defendant KI International, Inc. ("Defendant"), a Wisconsin corporation,

manufactures furniture and other institutional supplies exclusively for sale to dealers.  (Id. ¶¶ 2,

---

[1]  On January 4, 2012, Plaintiff filed two Complaints against Defendant.  Both
Complaints are premised on the same factual allegations, and differ only with respect to certain
claims and remedies sought by Plaintiff.  Specifically, the Complaint filed under Civil Action
Number 12-00032 requests injunctive relief, while the Complaint filed under Civil Action
Number 12-00033 seeks damages.  On April 3, 2012, upon stipulation by both parties, the Court
consolidated both matters under Civil Action Number 12-00032.  Prior to the consolidation,
however, Defendant filed separate Motions to Dismiss for each Complaint.  Accordingly, for the
sake of clarity, the Court refers to the Complaint originally filed under 12-00032 as "Complaint
#1" and the Complaint filed under 12-00033 as "Complaint #2."

8.)  For over fifty years, Plaintiff and Defendant have had a vendor-dealer relationship through which Plaintiff sells Defendant's products to end-users.  (Id. ¶ 9.)

Prior to January 31, 2008, Defendant owned all of the outstanding capital stock of a company called Olympic Industries, Inc. ("Olympic"), which in turn owned all of the outstanding capital stock of a subsidiary corporation, Adirondack Chair Co., Inc. ("Adirondack").  (Id. ¶¶ 10-11.)  Adirondack, like Plaintiff, is in the business of selling furniture and other supplies directly to a variety of institutions.  (Id. ¶¶ 12-13.)  Plaintiff alleges that Defendant sold its products to Adirondack at a lower price than other dealers, which provided Adirondack with a competitive advantage.  (Id. ¶ 15.)  In turn, Adirondack purchased more products from Defendant than any other dealer.  (Id. ¶ 16.)

On January 31, 2008, Plaintiff entered into a contract ("the Asset Purchase Agreement") with Defendant, Olympic, and Adirondack to purchase certain assets belonging to Adirondack, including its capital stock.  (Id. ¶ 17.)  Plaintiff paid $1,522,307.92 as consideration for the Asset Purchase Agreement, and further agreed to a Supply Agreement in which it would buy over $27 million worth of Defendant's products over the course of five years.  (Id. ¶¶ 18, 28.)  The Asset Purchase Agreement also included Covenant Not to Compete and Confidentiality clauses, which applied to Defendant and Olympic.  (Id. ¶ 19.)

According to Plaintiff, the Covenant Not to Compete precludes Defendant from making "any and all sales to end-user customers, whether by way of direct marketing, telephone sales, fax sales, catalog sales, Internet sales, or any other forms of sales . . . ."  (Id. ¶ 33.)  Plaintiff alleges that since January 31, 2008, when the Asset Purchase Agreement was signed, Defendant has breached the Covenant Not to Compete "by selling to end-user customers and thereby

competing with [Plaintiff] and Adirondack, and by becoming interested with entities that compete with [Plaintiff]." (Id. ¶ 34.)  Specifically, Plaintiff asserts that Defendant used call centers, field sales representatives, and a website to sell directly to end-user customers.  (Id.)  In further support of its allegation that Defendant has engaged in improper competition, Plaintiff asserts that several of Defendant's employees have actually admitted to selling directly to end-user customers, and that, between July 12 and August 24, 2011, Defendant actively sought to hire employees for the express purpose of executing such sales.  (Id.)  Finally, Plaintiff alleges that Defendant marketed directly to end-user customers and then closed sales through dealers other than Plaintiff.  (Id. ¶ 36.)  According to Plaintiff, Defendant's breach of the Covenant Not to Compete has resulted in a 75% decrease in Adirondack's sales and has prevented Plaintiff from performing its minimum purchase obligations pursuant to the Supply Agreement.  (Id. ¶¶ 42-43.)

Next, the Asset Purchase Agreement contains a Confidentiality clause which prohibits each party from using the confidential information of the other.  (Id. ¶¶ 58-62; id., Ex. A, Asset Purchase Agreement between and among Adirondack, Plaintiff, Olympic, and Defendant ("Asset Purchase Agreement") § H.6.)  The Complaint alleges that Adirondack's customer lists became the sole and exclusive confidential information of Plaintiff at the time the Asset Purchase Agreement commenced, and that Defendant violated the Confidentiality clause by using those lists to contact Plaintiff and Adirondack's customers.  (Compl. #1 ¶¶ 61, 63.)

Finally, the Supply Agreement—which obligated Plaintiff to buy a certain amount of products from Defendant over the course of five years—also contained a Confidentiality clause which, like the clause in the Asset Purchase Agreement, stated that customer lists and other information disclosed by one party to the other was to be kept confidential.  (Id. ¶¶ 77-79; id., Ex.

3

B, Supply Agreement between Plaintiff and Defendant ("Supply Agreement") ¶ 5(a).)  Plaintiff

alleges that Defendant violated the clause by using Adirondack's customer lists.  (Compl. ¶ 84.)

On January 4, 2012, Plaintiff filed two Complaints in this Court, setting forth the

following claims: (I) breach of the Covenant Not to Compete (Count I of Compl. #1 & #2); (II)

breach of the Confidentiality Provision of the Asset Purchase Agreement (Count II of Compl. #1

& #2); (III) breach of the Confidentiality Provision of the Supply Agreement (Count III of

Compl. #1); (IV) fraudulent inducement, fraudulent misrepresentation, and material non-

disclosure and omission (Count III of Compl. #2); and (V) misappropriation of trade secrets;

disgorgement of profits (Count IV of Compl. #2).  (Compl. #1 ¶¶ 29-93; Compl. #2 ¶¶ 28-83.)[2]

According to the Complaint, Defendant's conduct has caused Plaintiff to lose customers; past,

current, and future sales; the ability to compete on price; goodwill; market share; and the future

value of lost customer relationships.  (Compl. #1 ¶¶ 48, 69, 91.)  The Complaints seek damages,

declaratory relief, and an injunction to enforce the terms of the Asset Purchase and Supply

Agreements.  (Id. ¶¶ 115-17; Compl. #2 ¶¶ 50, 63, 69, 83, 85.)

On January 30, 2012, Defendant filed separate Motions to Dismiss for each Complaint.

Plaintiff responded in opposition to both on February 21, 2012.  Defendant filed Reply Briefs on

February 28, 2012, and Plaintiff filed Sur-Reply Briefs on March 6, 2012.  On April 3, 2012,

upon stipulation by both parties, this Court consolidated the two Complaints under Civil Action

Number 12-00032.  Accordingly, the Court considers Defendant's separate Motions to Dismiss

---

[2]  Complaint #1 also includes four other counts: (1) irreparable harm; inadequate remedy
for money damages; inadequate remedy at law (Count IV); (2) harm/hardship (Count V); (3)
public interest (Count VI); and (4) relief sought (Count VII).  (Compl. ¶¶ 94-117.)  These counts
merely set forth the basis upon which Plaintiff believes it is entitled to injunctive relief; they are
not claims in and of themselves.

together in a single Memorandum.

## II.   STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555.  It emphasized that it would not require a "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  Id. at 570.

In the subsequent case of Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court enunciated two fundamental principles applicable to a court's review of a motion to dismiss for failure to state a claim.  First, it noted that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  Thus, although "[Federal] Rule [of Civil Procedure] 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Id. at 678-79. Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss."  Id. at 679.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

5

Notwithstanding the foregoing, nothing in <u>Twombly</u> or <u>Iqbal</u> has altered some of the

fundamental underpinnings of the Rule 12(b)(6) standard of review.  <u>Arner v. PGT Trucking,</u>

<u>Inc.</u>, No. Civ.A.09-0565, 2010 WL 1052953, at *2 (W.D. Pa. Mar. 22, 2010); <u>Spence v.</u>

<u>Brownsville Area Sch. Dist.</u>, No. Civ.A.08-0626, 2008 WL 2779079, at *2 (W.D. Pa. July 15,

2008).  Federal Rule of Civil Procedure 8 requires only a short and plain statement of the claim

showing that the pleader is entitled to relief and need not contain detailed factual allegations.

Fed. R. Civ. P. 8; <u>Phillips v. Cnty. of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008).  Further, the

court must "accept all factual allegations in the complaint as true and view them in the light most

favorable to the plaintiff."  <u>Buck v. Hampton Twp. Sch. Dist.</u>, 452 F.3d 256, 260 (3d Cir. 2006).

Finally, the court must "determine whether, under any reasonable reading of the complaint, the

plaintiff may be entitled to relief."  <u>Pinkerton v. Roche Holdings Ltd.</u>, 292 F.3d 361, 374 n.7 (3d

Cir. 2002).

## III.    DISCUSSION

In its Motions to Dismiss, Defendant asserts the following: (1) Plaintiff's interpretation of

the Asset Purchase Agreement's Covenant Not to Compete is an illegal contract under the

Sherman Act; (2) Plaintiff has failed to state a claim for attorney's fees and costs; (3) Plaintiff's

tort claims for fraudulent inducement, fraudulent misrepresentation, material non-disclosure and

omission, and misappropriation of trade secrets are barred by the gist of the action doctrine; (4)

Plaintiff's request for declaratory relief should be dismissed as duplicative; (5) Plaintiff should be

required to re-plead to clarify the pleadings, delineate paragraphs, and identify alternative

pleadings; and (6) the Court should strike Plaintiff's allegations pertaining to the breach of the

Supply Agreement's pricing provisions.  The Court considers each argument in turn.

A.     **Whether Plaintiff's Interpretation of the Covenant Not to Compete Violates the Sherman Act**

Section 1 of the Sherman Antitrust Act states in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1. Pursuant to the Sherman Act, "'a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.'"  Palmer v. BRG of Ga., Inc., 498 U.S. 46, 48 (1990) (quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940)).  Covenants not to compete, however, are not violations of section 1 of the Sherman Act.  Eichorn v. AT & T Corp., 248 F.3d 131, 145 (3d Cir. 2001).  According to the Third Circuit Court of Appeals, such agreements are "executed upon the legitimate transfer of ownership of a business" and are therefore merely "ancillary restraints on trade."  Id.

In this case, the Asset Purchase Agreement between the two parties includes a Covenant Not to Compete, which states as follows:

> As a material inducement to Buyer's consummation of the transactions contemplated in this Agreement, none of the Seller Parties shall, during the five (5) years following the Closing (the "Restricted Period"), do any of the following, directly or indirectly, without the prior written consent of Buyer in its sole discretion:
> a. compete, directly or indirectly, in the Business as conducted as of the Closing  (the "Restricted Business"), with Buyer or any of its affiliates, or any of their respective successors or assigns, whether now existing or hereafter created or acquired (collectively, the "Related Companies"), within the United States, Canada or Mexico (the "Restricted Area"), provided that the Seller Parties shall be permitted to establish and host extranet customer sites for their customers and permit such customers to purchase products through individual portals;
> b. become interested (whether as owner, stockholder, lender, partner, co-venturer, director officer, employee, agent, consultant or otherwise),

7

directly or indirectly, in any entity that engages in the Restricted Business within the Restricted Area; provided, that Seller and Parent may own, as a passive investor, and not as part of a group with each other, not more than one percent (1%) of the outstanding securities of any class of any publicly traded securities of such entity;

c.   solicit, call on, influence or induce, or attempt to solicit, call on, influence or induce, any customer, supplier or vendor, distributor, consultant, agent, or independent contractor of ATD or the Business for the purpose of terminating or curtailing any contract, arrangement or relationship with ATD or the Business; or

d.   hire any employee of the Business or solicit, influence or induce any employee of the Business to leave the employ of the Buyer.

(Asset Purchase Agreement § H.7(a).)  In this context, "the Business" refers to "a business engaged in the direct marketing and sales through catalogs and the Internet of furniture and office and other institutional supplies, including, but not limited to, through catalogs under the name 'Adirondack Direct' and through the domain name 'www.adirondackdirect.com.'"  (Id. at 1.)

In the Complaints, Plaintiff alleges that the Covenant Not to Compete precludes Defendant from making "any and all sales to end-user customers, whether by way of direct marketing, telephone sales, fax sales, catalog sales, Internet sales, or any other forms of sales [.]"  (Compl. #1 ¶ 33; Compl. #2 ¶ 32.)  Plaintiff asserts that Defendant has breached this provision of the Asset Purchase Agreement, and seeks an injunction that would prevent Defendant from doing the following: selling its products to "end-user customers;" soliciting Plaintiff's customers or using any of Plaintiff or Adirondack's customer lists and information; becoming interested in any entity that sells or markets furniture and other institutional supplies in the United States, Canada, or Mexico; or providing customer leads to any dealers other than Plaintiff.  (Compl. #1 ¶ 117.)  Plaintiff also seeks damages in connection with the alleged breach.  (Compl. #2 ¶ 50.)

Defendant argues that Plaintiff's interpretation of the contract is a facial violation of the

Sherman Act.  Specifically, Defendant contends that, under Plaintiff's construction of the Covenant Not to Compete, the two parties "entered into a contract which allocates the markets (both geographical and by customer type) in which [Plaintiff] will have full protection from competition of any sales by a dominant competitor, and further, that that competitor cannot conduct any business at all, in any manner, including with competing distributors."  (Def.'s Mem. Supp. Mot. Dismiss Compl. #1 ("Def.'s Mem. #1") 10 (footnote omitted).)  According to Defendant, this arrangement is illegal because "it completely restricts competition for consumers in defined markets against competition."  (Id.)

Next, while Defendant acknowledges that ancillary restraints on competition are not unlawful, it contends that the Complaint alleges that the Covenant Not to Compete was essential and inseparable from the Asset Purchase Agreement.  (Id. at 11.)  Furthermore, Defendant argues that the Covenant "is a complete restraint on all sales by [Defendant] to anyone (other than [Plaintiff]), anywhere, of anything, whether end-users or distributors.  It further restricts all *its other competitors* from dealing with [Defendant], a dominant market player."  (Id.)  According to Defendant, "[t]he massive scope of the restraint of trade," is an illegal contract that cannot be enforced.  (Id. at 12.)

In support of its position, Defendant relies heavily on the United States Supreme Court's decision in Palmer.  (Def.'s Mem. #1 7-10.)  In Palmer, the respondent and another company—which both offered bar examination preparation courses—entered into an agreement in which the non-party company would not compete in Georgia and the respondent would not compete outside of Georgia.  498 U.S. at 47.  Thereafter, the price of the respondent's bar review course went from $150 to over $400.  Id.  The Supreme Court held that agreements such as this

"are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other." Id. at 49-50.  The Supreme Court therefore concluded that the agreement was unlawful on its face. Id. at 50.

The Court disagrees with Defendant's argument for several reasons.  First, claims under the Sherman Act may be brought by someone who was injured by anti-competitive activity or by the state or federal government.  See 15 U.S.C. §§ 9, 15, 15a, 15c.  The Court is unaware of any precedent wherein a party to a purportedly illegal contract, who has not alleged any injury, sought a declaration that the agreement it signed violates the Sherman Act.  Therefore, it is not even clear that Defendant has standing to raise this argument as a defense.  See Eichorn, 248 F.3d at 140 ("Private plaintiffs pursuing claims under § 1 of the Sherman Act have standing *when they suffer an antitrust injury* that is causally related to the defendants' allegedly illegal anti-competitive activity.") (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (emphasis added)).

Second, Plaintiff has expressly denied that it is seeking the type of injunctive relief that Defendant argues would violate the Act.  According to Plaintiff, "the non-compete is only for direct sales to retail and/or end-user customers for five years. . . .  [Defendant] is free to sell to all of its dealers/re-sellers, as long as it does not violate § H.7(b) of the non-compete."  (Pl.'s Resp. Opp'n Mot. Dismiss Compl. #1 ("Pl.'s Resp. Opp'n #1") 9.)  Therefore, Defendant's assertion that the injunction would prohibit it from selling its products to distributors other than Plaintiff is incorrect.  Plaintiff is merely claiming that Defendant itself cannot enter the market as a distributor for a specified period of time, and Defendant has not argued that this construction of

10

the Covenant Not to Compete would violate the Sherman Act.[3]

Finally, even assuming Defendant's characterization of Plaintiff's request for injunctive relief is accurate—and Plaintiff insists that it is not—Defendant has failed to show how the restrictive covenant rises to the level of an antitrust violation.  This case is not like <u>Palmer</u>, where two companies offered the same product at the same market level.  Here, Plaintiff and Defendant are at two different ends of the supply chain.  Defendant manufactures furniture and office supplies, and Plaintiff markets and sells it to the public.  Therefore, contrary to Defendant's argument, Plaintiff is not seeking to "split the market," because Plaintiff—which is entirely reliant on Defendant or other manufacturers for its merchandise—simply does not have this capability.  Rather, Plaintiff's interpretation of the Covenant Not to Compete—at least as construed by Defendant—is tantamount to an exclusive right to distribute Defendant's product.  In other words, no company other than Plaintiff, including Defendant itself, could sell directly to

---

[3]  Defendant's argument that the requested injunction would bar it from selling to anyone other than Plaintiff itself appears to stem from a misinterpretation of one of the allegations contained in the Complaint.  In discussing Plaintiff's claims, Defendant quotes a relevant section of the Complaint as follows: "'This is in violation of the Covenant Not to Compete in the Asset Purchase Agreement, as Mr. Watson admits . . . closing sales through dealers other than [Plaintiff], when [Plaintiff] does business nationwide and worldwide.'"  (Def.'s Mem. #1 6 (quoting Compl. #1 ¶ 36) (ellipsis included by Defendant).)  Read this way, one would assume that Defendant violated the restrictive covenant merely by doing business with other dealers.

The Complaint, however, actually alleges the following: "This is in violation of the Covenant Not to Compete in the Asset Purchase Agreement, as Mr. Watson admits *marketing directly to end-use consumers* and then closing sales through dealers other than [Plaintiff], when [Plaintiff] does business nationwide and worldwide."  (Compl. #1 ¶ 36 (emphasis added).)  Therefore, it is clear that the alleged violation of the Covenant Not to Compete derives not from the sale of Defendant's products to other dealers, but from the marketing of Defendant's products to the public at large, and then using other dealers to complete the sales that result from that marketing.  Regardless of whether or not this activity actually violates the Covenant Not to Compete—and the Court makes no finding on this issue—it is certainly a less restrictive reading of the contract than Defendant suggests.

the public.  Such an arrangement, on its face, would not violate the Sherman Act.  See Peerless

Dental Supply Co. v. Weber Dental Mfg. Co., 283 F. Supp. 288, 289 (E.D. Pa. 1968) ("An

exclusive dealership . . . not part of a scheme to monopolize or fix prices, 'has invariably been

upheld as a reasonable restraint of trade[.]'") (quoting Packard Motor Car Co. v. Webster Motor

Car Co., 243 F.2d 418, 420 (D.C. Cir. 1957)).  Defendant's Motion to Dismiss Plaintiff's request

for injunctive relief and claims for damages related to the Covenant Not to Compete is therefore

denied.

      **B.**     **Plaintiff's Request for Attorneys' Fees and Costs**

Defendant moves to dismiss Plaintiff's claim for attorneys' fees and costs, which Plaintiff

does not oppose.  (Pl.'s Resp. Opp'n #1 18; Pl.'s Resp. Opp'n Mot. Dismiss Compl. #2 ("Pl.'s

Resp. Opp'n #2) 18.)  Accordingly, Defendant's Motion to Dismiss this claim is granted.

      **C.**     **Whether the Gist of the Action Doctrine Requires Dismissal of Plaintiff's Claims for Fraudulent Inducement, Fraudulent Misrepresentation, Material Non-Disclosure and Omission, and Misappropriation of Trade Secrets**

In Pennsylvania,[4] the "gist of the action" doctrine "maintain[s] the conceptual distinction

---

[4] The Asset Purchase Agreement states that "This Agreement and the legal relations among the Parties shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in New York."  (Asset Purchase Agreement § I ¶ 5.)  The Supply Agreement states that "This Agreement and any disputes hereunder shall be governed by and construed in accordance with the internal laws of the State of Illinois."  (Supply Agreement ¶ 14.)  Choice of law provisions such as these, however, "do not govern tort claims between contracting parties unless the fair import of the provision embraces all aspects of the legal relationship."  Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc., 848 F. Supp. 569, 576 (E.D. Pa. 1994).  Defendant contends, and Plaintiff does not dispute, that the choice of law provisions in this case pertain only to the contractual relationships between the parties, and that Plaintiff's tort claims should therefore be analyzed under the laws of the forum.  (Def.'s Mem. 15-18.)

The Court agrees that the choice of law provisions are limited to the Asset Purchase and Supply Agreements.  Furthermore, there does not appear to be any conflict among Pennsylvania, New York, and Illinois with respect to the interrelation of tort and contract law in this context.  In

between breach of contract claims and tort claims. . . . [by] preclud[ing] plaintiffs from recasting

ordinary breach of contract claims into tort claims." eToll, Inc. v. Elias/Savion Adver., Inc., 811

A.2d 10, 14 (Pa. Super. Ct. 2002) (citations omitted).[5]  The mere existence of a contractual

relationship between two parties, however, does not preclude one party from bringing a tort claim

against the other.  Rather, "[w]hen a plaintiff alleges that the defendant committed a tort in the

course of carrying out a contractual agreement, Pennsylvania courts examine the claim and

determine whether the 'gist' or gravamen of it sounds in contract or tort." Sunquest Info. Sys.,

Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999) (citation omitted).

To that end, courts will bar tort claims: "(1) arising solely from a contract between the parties; (2)

where the duties allegedly breached were created and grounded in the contract itself; (3) where

the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of

contract claim or the success of which is wholly dependent on the terms of a contract." eToll,

---

New York, "'a tort cause of action generally does not lie where it is duplicative of a claim
sounding in contract.  However, an actionable tort may exist when the plaintiff asserts that the
defendant breached a duty independent of the contract.'" Icebox-Scoops v. Finanz St. Honore,
B.V., 676 F. Supp. 2d 100, 112-13 (E.D.N.Y. 2009) (quoting Consol. Risk Servs., Inc. v. Auto.
Dealers WC Self Ins. Trust, No. Civ.A.06-871, 2007 WL 951565, at *2 (N.D.N.Y. Mar. 27,
2007)).  Illinois conforms to a comparable rule.  See, e.g., Chicago Messenger Serv., Inc. v.
Nextel Commc'ns, Inc., No. Civ.A.01-8820, 2003 WL 22225619, at *10 (N.D. Ill. Sept. 24,
2003) ("Illinois law is true to the distinction between contract claims and tort claims.  To the
extent that [the plaintiff's] allegations are, at their core, a claim for b[r]each of contract, then
relief is not warranted when simply repackaged as fraud-based claims.").  Accordingly, the Court
need not engage in a choice of law analysis, and will apply the laws of Pennsylvania to Plaintiff's
tort claims.  See Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir. 2007) (holding that
when "two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law
analysis is unnecessary").

   [5]  Although the Pennsylvania Supreme Court has not explicitly adopted the gist of the
action doctrine, both the Pennsylvania Superior Court and multiple United States District Courts
have predicted that it will.  Woods v. ERA Med LLC, No. Civ.A.08-2495, 2009 WL 141854, at
*6 n.11 (E.D. Pa. Jan. 21, 2009) (citing cases).

811 A.2d at 19 (citations and quotations omitted). "In other words, if the duties in question are intertwined with contractual obligations, the claim sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort." Sunburst Paper, LLC v. Keating Fibre Int'l, Inc., No. Civ.A.06-3959, 2006 WL 3097771, *2 (E.D. Pa. Oct. 30, 2006). Whether the gist of the action doctrine applies in any particular setting is a question of law. Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 103 (3d Cir. 2001).

Here, Count III of Complaint #2 alleges fraudulent inducement, fraudulent misrepresentation, and material non-disclosure and omission. (Compl. #2 ¶¶ 64-69.) Count IV alleges misappropriation of trade secrets, and seeks disgorgement of profits as a remedy. (Id. ¶¶ 70-83.) Defendant moves to dismiss all of these tort claims, arguing that they are barred by the gist of the action doctrine. The Court considers each Count separately.

### 1. Fraudulent Inducement, Fraudulent Misrepresentation, Material Non-Disclosure and Omission

In Pennsylvania, the elements of a fraudulent inducement claim and a fraudulent misrepresentation claim are identical. See EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 275-76 (3d Cir. 2010); Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 771 (3d Cir. 2009); Advance Capital Partners, LLC v. Rossmann, No. Civ.A.09-3467, 2011 WL 5428554, at *6-7 (E.D. Pa. Nov. 9, 2011). In order to succeed on either fraud claim, the plaintiff must demonstrate the following:

> "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."

14

EBC, 618 F.3d at 275-76 (quoting Skurnowicz v. Lucci, 798 A.2d 788, 793 (Pa. Super. Ct. 2002)).  With respect to material non-disclosure and omission, the law in Pennsylvania is clear that "'fraud consists in anything calculated to deceive, whether . . . it be direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.  It is any artifice by which a person is deceived to his disadvantage.'"  Smith v. Renaut, 564 A.2d 188, 191-92 (Pa. Super. Ct. 1989) (quoting In re McClellan Estate, 75 A.2d 595, 598 (Pa. 1950)).

This Court has previously recognized that claims of fraudulent inducement may be collateral to—rather than intertwined with—contractual obligations, and are not automatically barred by the gist of the action doctrine.  Integrated Waste Solutions, Inc. v. Goverdhanam, No. Civ.A.10-2155, 2010 WL 4910176, at *10 (E.D. Pa. Nov. 30, 2010).  The doctrine does apply, however, "[w]here the precontractual statements that are the basis for the fraudulent inducement claim concern specific duties that the parties later outlined in the alleged contract."  Id. at 11.

Count III of Complaint #2 alleges fraudulent inducement, fraudulent misrepresentation, and material non-disclosure and omission.  It states in relevant part:

65.  At all times relevant hereto, in negotiations and formation of the Asset Purchase Agreement and Supply Agreement, KI intentionally withheld material information from ATD, namely, that it (KI) planned and intended to operate call centers, to direct market to customers, to sell directly to customers on the Internet, and to continue to contact and solicit business from Adirondack and ATD customers in order to directly or indirectly compete with ATD after January 31, 2008, despite the parties negotiating and agreeing to a Covenant Not to Compete in the Asset Purchase Agreement.

66.  The Covenant Not to Compete is an essential term of the Asset Purchase Agreement.

67.  KI knowingly, intentionally, fraudulently, and outrageously induced ATD to enter into the Asset Purchase Agreement and Supply Agreement, paying $250,000 plus $1,272,370.92 accounts receivable for Adirondack, and committing to make $27,193,333 in purchases from KI over five (5) years, when, if ATD had been told that KI planned and intended all along to

15

> continue to compete with ATD after January 31, 2008, ATD would have
> never entered into the Asset Purchase Agreement and Supply Agreement at
> all.  Furthermore, if ATD had been told that KI never intended to provide
> "Most favored Nation" or ". . . equal to or less than . . ." prices for ATD
> compared to other KI customers that Adirondack had received before ATD
> bought Adirondack on January 31, 2008, then ATD also would have never
> entered into the Asset Purchase Agreement and Supply Agreement at all.

(Compl. #2 ¶¶ 65-67.)

Defendant contends that "the basis for [its] alleged fraud is completely tied up and intertwined with its obligations under the contract and what Plaintiff alleges [Defendant] breached in Count I and II of the Complaint."  (Def.'s Mem. #2 23.)  Therefore, because the fraud claims arise solely from the agreements and merely duplicate the breach of contract claims, they should be barred by the gist of the action doctrine.  (Id.)

In response, Plaintiff contends that Defendant's "fraud was entirely pre-performance, in the 'inducement' or 'formation' stage of the Asset Purchase and Supply Agreements.  In particular, [Defendant] concealed . . . that it was selling to retail and/or end-user customers in direct competition with its own subsidiary, Adirondack."  (Pl.'s Resp. Opp'n #2 19.)  According to Plaintiff, such competition had a negative effect on the value of Adirondack as a going concern, and Defendant's failure to disclose caused Plaintiff to overpay for Adirondack's assets. (Id. at 20.)  As such, Plaintiff asserts that it would have had a claim for fraudulent inducement regardless of whether Defendant breached the contract, and so the gist of the action doctrine does not apply.  (Id. at 21-22.)

The problem with Plaintiff's argument is that these allegations of harm stemming from pre-contractual competition are not contained in the Complaint.  Count III of Complaint #2 focuses entirely on Defendant's alleged failure to disclose what it intended to do after the

16

contracts commenced, not what it had done previously.  (See Compl. #2 ¶ 65 ("KI intentionally

withheld material information from ATD, namely, that it (KI) *planned and intended* . . . to

directly or indirectly compete with ATD *after* January 31, 2008.") (emphases added); id. ¶ 67

("KI knowingly, intentionally, fraudulently, and outrageously induced ATD to enter into the

Asset Purchase Agreement and Supply Agreement, . . . when, if ATD had been told that KI

*planned and intended* all along to continue to compete with ATD *after* January 31, 2008, ATD

would have never entered into the Asset Purchase Agreement and Supply Agreement at all.")

(emphases added).)  The Court is unable to locate any section of the Complaint that alleges that

the value of Adirondack was diminished by pre-contractual competition, or that Plaintiff

overpaid for Adirondack's assets because Defendant withheld information pertaining to such

competition.  Rather, as currently pleaded, the alleged fraud appears to derive from Defendant's

failure to notify Plaintiff that it intended to breach the Covenant Not to Compete.  Such a claim is

obviously intertwined with the duties imposed by the contract itself, and so the Court finds that it

is barred by the gist of the action doctrine.  Defendant's Motion to Dismiss Plaintiff's claims for

fraudulent inducement, fraudulent misrepresentation, and material non-disclosure and omission

is therefore granted.

## 2. Misappropriation of Trade Secrets

In Pennsylvania, the elements of a claim for misappropriation of trade secrets are as

follows: "(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a

confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm

to the plaintiff."  Moore v. Kulicke & Soffa Indus., Inc., 318 F.3d 561, 566 (3d Cir. 2003).

Here, Count IV of Complaint #2 alleges that Defendant "has knowingly, intentionally,

and outrageously misappropriated trade secrets in the form of confidential and proprietary information that has been the possession of [Plaintiff] since January 31, 2008 . . . ." (Compl. #2 ¶ 80.) According to Plaintiff, the trade secrets at issue are the customer lists and other information contained in the "Confidential Information" provisions of both the Asset Purchase and Supply Agreements. (Id. ¶¶ 71-76.)

Defendant moves to dismiss this claim, arguing that when a duty to keep trade secrets confidential arises pursuant to a contract, it is barred by the gist of the action doctrine. (Def.'s Mem. #2 24-25 (citing Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79 (3d Cir. 2001)). In response, Plaintiff cites to Defendant's brief in opposition to Plaintiff's separately filed Motion for a Preliminary Injunction, in which Defendant argues that Adirondack's customer lists are not confidential information under the Asset Purchase or Supply Agreements. (Pl.'s Resp. Opp'n #2 23.) According to Plaintiff, by making this argument, Defendant contradicts its current position, and concedes that the lists are confidential information *outside* the scope of the agreements. (Id. at 23-24.) Thus, a tort claim for misappropriation of trade secrets is not duplicative of the breach of contract claim. (Id.)[6]

The Court rejects Plaintiff's argument for two reasons. First, in opposing the Motion for a Preliminary Injunction, Defendant did not assert that Adirondack's customer lists are proprietary information outside the scope of the confidentiality agreements. Rather, it argued

---

[6] Plaintiff also argues that Defendant's position with respect to what can be considered confidential information or trade secrets is incorrect. (Pl.'s Resp. Opp'n #2 24.) Plaintiff's argument, however, pertains to statements made by Defendant in opposing Plaintiff's separately filed Motion for a Preliminary Injunction, not in support of the current Motion to Dismiss. Therefore, the Court declines to address whether Adirondack's customer lists qualify as "confidential information" under the Asset Purchase and Supply Agreements, and limits its discussion to whether the trade secrets claim is prohibited under the gist of the action doctrine.

18

that the lists belonged to Defendant before the contracts commenced, and were therefore not confidential materials at all.  (Def.'s Mem. Supp. Resp. Opp'n Pl.'s Mot. Prelim. Inj. 12; Def.'s Reply Br. 2.)  Thus, a more accurate characterization of Defendant's argument is as follows: to the extent Plaintiff has stated a claim for improper use of Adirondack's customer lists, it is governed by the terms of the contract, but even that claim must fail because the information at issue cannot be considered "confidential."  Therefore, the Court finds nothing contradictory about the manner in which Defendant has addressed the trade secrets and breach of contract claims.

Second, regardless of the arguments made by Defendant in opposing a separately filed motion, the Court's role in deciding the present Motion to Dismiss is to look to the Complaint itself and determine whether Plaintiff has stated a claim for misappropriation of trade secrets. Having done so, the Court concludes that the claim arises solely from the Confidentiality provisions of the Asset Purchase and Supply Agreements.  The Complaint expressly states that the alleged trade secrets at issue—Adirondack's customer information—are to be kept confidential pursuant to these contracts.  Plaintiff has not identified any other proprietary information that was shared by the two parties but not contemplated by the Confidentiality provisions.  Accordingly, Plaintiff's cause of action for misappropriation of trade secrets is barred by the gist of the action doctrine, and Defendant's Motion to Dismiss this claim is granted.[7]

_____

[7]  The claims for fraudulent inducement, fraudulent misrepresentation, material non-disclosure and omission, and misappropriation of trade secrets include requests for punitive damages.  (Compl. #2 ¶¶ 69, 83.)  In a separate section of its brief, Defendant argues these requests should be denied even if the underlying claims are not barred by the gist of the action doctrine.  (Def.'s Mem. #2 25-28.)  Obviously, because the Court is dismissing the tort claims,

**D.** **Whether Plaintiff's Request for Declaratory Relief Should be Dismissed as Duplicative**

Count V of Complaint #2 asks the Court to declare the following: (1) "Defendant Krueger International, Inc., has breached the Covenant Not to Compete of the Asset Purchase Agreement;" and (2) "Defendant Krueger International, Inc., has breached the Confidentiality provision of the Asset Purchase Agreement."  (Compl. #2 ¶ 85.)  Defendant moves to dismiss this Count pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f), arguing that it merely duplicates the breach of contract claims.  (Def.'s Mem. #2 29.)  Rule 12(f) allows a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  In response, Plaintiff notes that although a district court has the discretion to dismiss duplicative claims, it is not required to do so.  (Pl.'s Resp. Opp'n #2 30-31.) Furthermore, "a ruling on breach of contract would not have the identical effect of a declaratory judgment, which would be a clear finding, not just of [Defendant's] misconduct, but of contract interpretation."  (Id. at 31.)

While Plaintiff is correct that declaratory judgments may help clarify the terms of a contract, the request for declaratory relief in this case does not ask the Court to interpret specific language in the Asset Purchase Agreement; it merely asks for a broad declaration that the contract was breached.  The Court is unable to discern any difference between this claim and Counts I and II of Complaint #2, which are claims for breach of the Covenant Not to Compete and the Confidentiality provision of the Asset Purchase Agreement.  Accordingly, because the request for declaratory relief merely duplicates these other claims for breach, the Court finds that

---

the requests for punitive damages made in connection with these claims are dismissed as well.

it would be most practical and efficient to grant Defendant's Motion to Dismiss Count V of

Complaint #2.

> **E.      Whether Plaintiff Should be Required to Re-Plead to Clarify the Pleadings,
> Delineate Paragraphs, and Identify Alternative Pleadings**

Pursuant to Federal Rule of Civil Procedure 10(b),

> [a] party must state its claims or defenses in numbered paragraphs, each limited as
> far as practicable to a single set of circumstances.  A later pleading may refer by
> number to a paragraph in an earlier pleading.  If doing so would promote clarity, each
> claim founded on a separate transaction or occurrence—and each defense other than
> a denial—must be stated in a separate count or defense.

Fed. R. Civ. P. 10(b).  When a pleading "is so vague or ambiguous that the party cannot

reasonably prepare a response," the responding party may file a motion for a more definite

statement.  Fed. R. Civ. P. 12(e).

Here, Defendant contends that both Complaints violate Rule 10(b) because they contain

multiple allegations in each paragraph, which makes them difficult to answer.  (Def.'s Mem. #1

16-18; Def.'s Mem. #2 31-33.)  As examples, Defendant cites to Paragraphs 23 and 43 of

Complaint #1, as well as Paragraphs 22 and 42 of Complaint #2, which contain six separate

averments.  (Def.'s Mem. #1 16; Def.'s Mem. #2 32.)  Plaintiff responds that while certain

paragraphs of the Complaints contain multiple sentences, they are each related to a single set of

circumstances and therefore comply with Rule 10(b).  (Pl.'s Resp. Opp'n #1 19-20; Pl.'s Resp.

Opp'n #2 34.)  The Court agrees with Plaintiff.  Although some paragraphs in the Complaints

contain a significant amount of information, they are not confusing, and the Court finds that

Defendant will not be prejudiced by having to answer these pleadings in their current form.

Therefore, Defendant's request to segregate the allegations into separate paragraphs is denied.

Next, Defendant notes that, at certain points in the Complaints, Adirondack is referred to as a subsidiary of Plaintiff, while at other points it is named as a subsidiary of Olympic.  (Def.'s Mem. #1 17-18; Def.'s Mem. #2 32.)  Furthermore, the Complaints state that Plaintiff both did and did not purchase Adirondack's stock.  (Def.'s Mem. #1 17-18; Def.'s Mem. #2 32.)  Finally, the Complaints sometimes refer to "ATD/Adirondack," implying a unity of interest, while at other times it refers to the two entities separately.  (Def.'s Mem. #1 18; Def.'s Mem. #2 32-33.)  According to Defendant, these conflicting accounts make it difficult to determine who Adirondack is, and whether other indispensable parties need to be joined in this action.  (Def.'s Mem. #1 18; Def.'s Mem. #2 33.)  Defendant therefore requests that Plaintiff provide a more definite statement by clarifying the identity of Adirondack.  (Def.'s Mem. #1 18; Def.'s Mem. #2 33.)

In response, Plaintiff admits that the Complaints contain some inconsistent and inaccurate allegations.  Specifically, Plaintiff now alleges that it only purchased Adirondack's assets, not its stock, and that Adirondack never became Plaintiff's subsidiary.  (Pl.'s Resp. Opp'n #1 21; Pl.'s Resp. Opp'n #2 35.)  Nevertheless, Plaintiff contends that Defendant is fully aware of what Plaintiff purchased based on what is contained in the Asset Purchase Agreement, and that the Complaints are not so vague or ambiguous that Defendant is unable to respond.  (Pl.'s Resp. Opp'n #1 21-22; Pl.'s Resp. Opp'n #2 36.)

The Court finds that the interests of justice would be best served by having Plaintiff file an amended complaint.  First, now that the two civil actions that form the basis of this litigation have been consolidated, it would be much more efficient for the Court and the parties to work from a single complaint.  Second, amendment would give Plaintiff the opportunity to correct the

22

errors with regard to Adirondack and ensure that the pleadings are as accurate as possible.

Therefore, Defendant's request that Plaintiff provide a more accurate definition of "Adirondack"

is granted.  Plaintiff shall have twenty days from the date of the accompanying Order to file its

amended complaint.

      **F.**    **Whether the Allegations Related to Breach of the Supply Agreement's Pricing Provisions Should be Stricken from the Record**

      Both Complaints contain several references to pricing provisions that are contained in the

Supply Agreement, and allege that Defendant breached these provisions by failing to give

Plaintiff favorable pricing on its products.  (See, e.g., Compl. #1 ¶¶ 38, 40, 43, 44, 107, 116;

Compl. #2 ¶¶ 37, 42, 43.)  Defendant seeks to strike these references as immaterial and

impertinent pursuant to Rule 12(f), arguing that such claims are subject to arbitration and not part

of this litigation.  (Def.'s Mem. #1 19; Def.'s Mem. #2 33-34.)  It notes that although Plaintiff's

separately filed Motion for a Preliminary Injunction seeks equitable relief on the pricing

provision on a preliminary basis, such a request is not included in the "Wherefore Clause" of

Complaint #1.  (Def.'s Mem. #1 19.)  In response, Plaintiff contends that the pricing provision

allegations help to put its claims into a proper context.  (Pl.'s Resp. Opp'n #1 22-23; Pl.'s Resp.

Opp'n #2 37.)  Furthermore, even though the Supply Agreement claims will ultimately be

resolved through arbitration, they may be subject to a preliminary injunction.  (Pl.'s Resp. Opp'n

#1 22-23; Pl.'s Resp. Opp'n #2 37.)

      Despite alleging that Defendant has not complied with the pricing provisions of the

Supply Agreement—and seeking to compel such compliance in the Motion for a Preliminary

Injunction—Plaintiff does not actually include a cause of action for the breach in either

Complaint.  It is not clear to the Court why Plaintiff, believing it was entitled to equitable relief for Defendant's alleged breach of the pricing provisions, failed to state this claim in its pleadings. Nevertheless, because the Court is ordering Plaintiff to file an amended complaint, Plaintiff may properly assert a claim for breach of the pricing provisions of the Supply Agreement when it files the amendment.  As such, the Court cannot conclude at this time that the references to the pricing provisions are immaterial or impertinent.  Defendant's Motion to Dismiss these references is therefore denied.

## IV.      CONCLUSION

For all the foregoing reasons, the Court concludes as follows: (1) the Covenant Not to Compete contained in the Asset Purchase Agreement does not violate the Sherman Act; (2) Plaintiff has failed to state a claim for attorneys' fees and costs; (3) Plaintiff's tort claims for fraudulent inducement, fraudulent misrepresentation, material non-disclosure and omission, and misappropriation of trade secrets are barred by the gist of action doctrine; (4) Plaintiff's request for declaratory relief is duplicative of its breach of contract claims; (5) Plaintiff's pleadings comply with Rule 10(b), but its definition of "Adirondack" needs to be clarified via an amended complaint; and (6) Plaintiff's allegations pertaining to the breach of the Supply Agreement's pricing provisions are not impertinent or immaterial, but Plaintiff needs to formally include a claim for breach in its amended complaint.

In accordance with these findings, Defendant's Motions to Dismiss are granted in part and denied in part as set forth in the accompanying Order.