## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ATD-AMERICAN CO., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.   12-00032 |
| KRUEGER INTERNATIONAL, INC. | : | |
| | : | |
| Defendant. | : | |

### MEMORANDUM

BUCKWALTER, S.J.                                                    October 8, 2013

Currently pending before the Court are the Cross-Motions for Summary Judgment by

Plaintiff ATD-American Co. ("ATD") and by Defendant Krueger International, Inc. ("KI").  For

the following reasons, both Motions are denied.

## I.    FACTUAL HISTORY[1]

### A.    The Parties

Plaintiff ATD is a retail seller of commercial furniture and institutional supplies, with its

headquarters and principal place of business in Wyncote, Pennsylvania.  (Pl.'s Mot. Summ. J.,

Ex. M, Amended & Consolidated Complaint ("Am. Compl.") ¶¶ 1, 7.)  ATD purchases products

---

[1] The parties have provided factual "summaries" consisting of hundreds of separate
allegations referencing thousands of pages of exhibits.  Many of these recitations rise to the level
of argument as opposed to a statement of pertinent facts.  To the extent an allegation is disputed,
not supported by the cited exhibit, an argument rather than a statement of fact, a legal
interpretation of the contract, or not relevant or necessary to an understanding of the factual
background of the present dispute, the Court disregards it.

By way of further note, many of the alleged "undisputed" facts are, in point, highly
disputed by the parties.

from suppliers such as KI and sells them to institutional customers and businesses, including schools, religious institutions, government agencies and businesses.  (Id. ¶ 7; Pl.'s Mot. Summ. J., Ex. ZZ, Dep. of William McDonough ("McDonough Dep."), 65:24–67:15, Nov. 27, 2012.)

Defendant KI is a commercial furniture manufacturer with its headquarters and principal place of business in Green Bay, Wisconsin.  (Am. Compl. ¶¶ 2, 8; Pl.'s Mot. Summ. J., Ex. QQ, Def.'s Answer to Amended & Consolidated Complaint ("Answer") ¶¶ 2, 8.)  KI sells furniture to ATD, who, in turn, sells the furniture to "end-user" consumers.  (Am. Compl. ¶ 11; Answer ¶ 11; Pl.'s Mot. Summ. J., Ex. AAA, Dep. of Eric Wischnia ("E. Wischnia Dep. Day 2"), 63:1–9, March 1, 2013.)  ATD has purchased and sold products from KI for many years.  (Am. Compl. ¶ 9; Answer ¶ 9.)

Olympic Industries, Inc. ("Olympic") is a subsidiary of KI.  (Pl.'s Mot. Summ. J., Ex. E, Dep. of Robert Charles ("Charles Dep."), 13:1–2, July 17, 2012; Pl.'s Mot. Summ. J., Ex. A, Asset Purchase Agreement ("APA") at 1, Recitals ¶ (b).)  Prior to January 31, 2008, Olympic owned all of the outstanding capital stock and assets of the Adirondack Chair Co., Inc. ("Adirondack").  (APA at 1, Recitals ¶ (b).)  Olympic's only known function was to serve as an intermediary between KI and Adirondack.  (Charles Dep. 13:22–14:3.)  Although the stock of Adirondack was held by Olympic because KI "preferred not to have it known in the general public that [KI] owned [Adirondack]," (Pl.'s Mot. Summ. J., Ex. C, Dep. of Mark Olsen ("Olsen Dep."), 11:4–15, July 18, 2012), Adirondack was an "indirect subsidiary" of KI.  (Am. Compl. ¶ 14; Answer ¶ 14.)

Prior to January 31, 2008, Adirondack contained two divisions: the catalog division and

the rental division.[2]  (Pl.'s Mot. Summ. J., Ex. G.)  During that time period, the catalog division

was, like ATD, a retail seller of commercial furniture and institutional supplies.  (Pl.'s Mot.

Summ. J., Ex. G.)  According to the Adirondack Strategic Summary, the business of the catalog

division was "sales of new furniture."  (Id.)  The rental division, on the other hand, focused on

the rental of furniture and sales of used rental stock.  (Id.)

> **B.      The Background Behind the Asset Purchase Agreement**

ATD and KI entered into an Asset Purchase Agreement ("APA" or "Agreement") on

January 31, 2008.  (APA at 1.)  Via this Agreement, ATD bought certain assets used in

Adirondack's "catalog division" from KI and Olympic Industries.  (Id.)  Specific assets were

expressly excluded from the sale including the corporate stock, cash, and cash equivalents on

hand, the trade name "Adirondack Rents," tax returns of Adirondack, assets unrelated to "the

Business," of the catalog division of Adirondack, and any assets owned or held by Olympic or

KI.  (Id. at 3 ¶ A.8.)  The genesis of this Agreement was set forth in a Letter of Intent ("Letter")

signed by both parties and dated December 21, 2007, which stated as follows:

> [t]his non-binding letter of intent is to confirm the interest of Adirondack Chair
> Co., Inc. ("ADCO") in selling certain of its assets utilized in ADCO's catalog
> division to ATD-AMERICAN Co. ("ATD").

(Pl.'s Mot. Summ. J., Ex. B.)  The Letter goes on to define "certain assets" of Adirondack as

---

[2]   KI takes issue with ATD's characterization of these divisions as formal divisions and
suggests that the use of capitalized terms "Rental Division" and "Catalog Division" is a fiction.
KI, however, does not deny that Adirondack did in fact—be it formally or informally—have both
a "rental division" and a "catalog division" that operated under the umbrella of the Adirondack
organization  Accordingly, the Court will refer to these two divisions by their proposed names,
albeit without the capitalization to which KI so vehemently objects.
    On a related note, the documents reference a third division of Adirondack—A
Partymaker—a division which neither party discusses in any great detail.  Nonetheless, the Court
notes that this third division did appear to exist at some point.

"substantially all of the assets utilized by ADCO in its catalog business operations." (Id.)  This Letter constituted the final version of multiple prior draft letters, and no further letters of intent or other writings concerning the intent of the parties were exchanged by ATD and KI between December 21, 2007 and the closing of the APA on January 31, 2008.  (Pl.'s Mot. Summ. J., Ex. H; Olsen Dep. 34:2–3.)

Several witnesses testified as to the intent behind the Asset Purchase Agreement.  Robert Charles, Esq., the attorney who negotiated the APA on behalf of KI and signed on behalf of Olympic Industries, stated:

> Q.   Am I correct that in the asset purchase it was the catalog division that was sold to ATD?
>  . . .
> A.   There were the assets—
> Q.   Yes.  The assets of the catalog division were sold to ATD; is that correct?
> A.   Roughly stated, yes.
> . . .
> Q.   And am I correct that the assets of the catalog division are what is in paragraph A of the recitals of the first page of the asset agreement?
> . . .
> A.   No.  It would be more accurate to say the assets of the catalog division are the assets that are defined as the assets sold.
> Q.   On page 2 of the asset purchase agreement?
> A.   Correct?
> Q.   So the assets of the catalog division were sold.  Those assets are identified on page 2 under Section 4, assets of the asset purchase agreement; is that correct?
> A.   I believe that's correct.
> Q.   And to move back, those asset that were sold that were of the catalog division are also referenced in paragraph c of the recitals where it initially states that the assets used in or usable to the business were being transferred?
> A.   A general reference to it, yes.
> Q.   And the assets used or usable in the business, and it would include the catalog division assets that you just identified in Section 4 on page 2, which were also identified in Section C of page 1 of the asset purchase agreement, and these are the assets of quote the business in paragraph A of the recitals; is that right?

> A.    I think we're getting to the same end, yes.  Some are just more generic references, whereas the definition of assets is meant to be more specific.
>
> Q.    And to put it more generally, was it contemplated at the time that the catalog division was being sold?
>
> . . .
>
> A.    In layman's terms that phrase could have been used, yes.
>
> Q.    And was it contemplated that the catalog division would continue to function simply owned by ATD going forward?
>
> A.    Again, what ATD did with the assets—it was assumed largely because we had a supply agreement, we were hoping they would continue operations because they needed to buy product from KI.  So whether they used this computer or burned that table or did whatever, we don't know, but it was assumed that they would be operating a catalog—as a catalog company going forward probably using the assets that they paid KI money for or ADCO for.

(Charles Dep. 89:13–91:19.)  Mr. Charles, however, clarified that it was not a "catalog company" that was sold, but rather the assets of the "catalog company" with no company stock equity.  (Id. at 42:18–43:13.)  He explained that ATD did not buy the entire catalog and furniture business, but rather only the assets that were "used or useful in the business."  (Id. at 61:8–11.)  It was not contemplated that the entire catalog and furniture business would get transferred to ATD.  (Id. at 74:12–21.)  Further, Mark Olsen, the Chief Financial Officer of KI at the time of the sale and the representative who signed the APA on behalf of KI testified that it was his understanding that the assets that were sold were the assets of the catalog division and that the catalog division was a business that was engaged in the direct marketing and sales through catalogs and the Internet of furniture and office and other institutional supplies.  (Olsen Dep. 36:24–37:8.)  Finally, Randolph Mittasch, the Treasurer of the Adirondack Chair Co., Inc., who signed the APA on behalf of Adirondack, testified that the assets that were sold were the assets of the catalog division.  (Pl.'s Mot. Summ. J., Ex. F., Dep. of Ralph Mittasch ("Mittasch Dep."), 134:14–19, Sept. 24, 2012.)  Mr. Mittasch admitted to emailing an employee of KI that "[a]s you are aware KI will be selling

5

the Catalog Division probably January 31 (or the latest February 28)."  (Pl.'s Mot. Summ. J., Ex. I.)  Mittasch, however, clarified that there were some assets of the catalog division that were maintained by Adirondack.  (Mittasch Dep. 133:23–134:12.)

> **C.**     **The Catalog Division of Adirondack Prior to the Asset Purchase Agreement**[3]

As a holding of KI, Adirondack's purported catalog division was involved in the business of "sales of new furniture."  As described by Joseph Torre, Adirondack's Director of Operations at the time of the asset purchase:

> Q.     So A Partymaker and Adirondack Rents didn't sell any furniture, right?
> A.     Uh — No.
> Q.     So all of your furniture sales came under the other division, right?
> A.     Right.
> Q.     Which was called what?
> A.     Which was called the catalog.  KI classified it under catalog and rents.
> Q.     Okay.  It was called the catalog division, right?
> A.     Correct.
> Q.     It wasn't called the furniture sales division, right?
> A.     No, KI always classified it as catalog.  And we had all of the marketing functions under that and the sales functions, but they classified it as catalog and —
> Q.     Each and every—each and every marketing function that you had for purposes of marketing sales as opposed to rental, each and every marketing function was classified under the catalog division, right?
> A.     Yes.
> Q.     And each and every sales function you had was classified under the catalog division, right?
> A.     Correct.

(Pl.'s Mot. Summ. J., Ex. K, Dep. of Joseph Torre ("Torre Dep.") 54:2–55:4, June 28, 2012.)  In

---

[3] Notably, Defendant denies that the business and sales practices of Adirondack or its "catalog division" prior to the APA are relevant to any issue in this case.  It asserts that the only relevance of Adirondack's business is how it conducted the "Business" as of the Closing and how the APA defines "Business."  The Court acknowledges Defendant's argument, but nonetheless reviews this section of Plaintiff's facts because Adirondack's ongoing business practices are indeed relevant to interpretation of the contract at issue.

2007, the catalog division sold products throughout the United States, as well as in Canada and Mexico.  (Pl.'s Mot. Summ. J., Ex. L; <u>see also</u> Mittasch Dep. 163:13–164:18 (discussing sales by Adirondack in general).)  Just four months prior to selling the assets, Adirondack indicated that the catalog division sold furniture "through direct mail marketing, outbound call center, outside sales, and the internet."  (Pl.'s Mot. Summ. J., Ex. G at ATD 11669.)

At its heart, Adirondack operated as a mail order catalog company.  (Mittasch Dep. 23:16–24:5.)  An issue of fact, however, exists about the percentage of sales that resulted from catalogs as opposed to other marketing methods.  KI contends that inbound sales through the call center resulting from the mailing of catalogs constituted about 94% of sales, while outbound sales from outbound calling and face-to-face meetings constituted only 4–6%.  (Mittasch Dep. 185:10–187:4; Torre Dep. 87:9–88:4.)  A small percentage of sales—less than 6%—came through the website.  (Torre Dep. 85:13–86:87:8.)  ATD, on the other hand, argues that Adirondack sales identified as involving catalogs constituted approximately 53% of overall sales. It avers that as of January 31, 2008—the closing date of the APA—the catalog division of Adirondack did some marketing and sales through numerous channels.  The extent to which it did so, however, remains unclear.  (Mittasch Dep. 21:1–3, 22:16–25:23, 166:16–19.)  Mr. Mittasch explained the connection among the various forms of marketing as follows:

> Q.     What I'm getting from you is that there is a synergistic relationship between the different ways you are touching customers; is that correct?
> . . .
> A.     Yes.
> Q.     So, you may send out a catalog, but you'll also have to call them; correct?
> . . .
> A.     We don't have to, but—
> Q.     But you did?
> A.     Right, we did.  There were many ways.  You are ultimately trying to touch the

|     |     |
| --- | --- |
|     | customers any way possible. |
| Q. | Right, or go face-to-face with them? |
| A. | Uh-huh. |
| Q. | And all those types of ways that you touched a customer, if it's for selling the furniture, then it came out of the Adirondack catalog division? |
| . . . |     |
| A. | Correct. |
| . . . |     |
| Q. | So, if you were to briefly describe the Adirondack catalog division, you may fairly describe it as a business that makes sales through catalogs and markets the catalogs [while KI owned it]? |
| A. | Yes. |
| Q. | And then under that big gambit of making sales through catalogs, one of the was that you could accomplish that and to support it would be to call a customer; correct? |
| A. | Correct. |
| Q. | And another way that you could help make sales through catalogs is to actually meet with the customer face-to-face; correct? |
| . . . |     |
| A. | Correct. |
| Q. | And another way that you could help make sales through catalogs is to send an e-mail to the customer? |
| A. | Correct. |
| Q. | And these are all things that would come in the business of sales through catalogs? |
| . . . |     |
| A. | Yes. |

(Mittasch Dep. 22:12–25:23.)  He went on to note that it was helpful to use more than one tactic

to "touch" a customer, (id. at 19:12–17), and that customers were not segregated into groups

according to the method used to solicit them.

|     |     |
| --- | --- |
| Q. | When we talk about what it means to compete in the furniture business, do customers particularly care how the get the furniture, how the vendor touches them? |
| A. | I don't know every customer.  I'm sure some care in some ways others don't care, you know. |
| Q. | What I'm saying is, is there a segregated market as in these are the physical catalog customers and these are the ones you call? |
| A. | No. |
| Q. | No, it's a cross section? |

A.      Right.
Q.      So, when you are competing in the sending out catalog business, you're
        competing in the telephone solicitation business.
A.      Okay.
Q.      It's one and the same.
A.      Okay.  We did have one—

(Mittasch Dep. 153:9–25.)  Indeed, the catalog division's marketing and sales operational plan

included increasing web sales by migrating catalog customers to order online and to expand a

proactive outside sales force.  (Pl.'s Mot. Summ. J., Ex. G at ATD11671.)  The catalog division

appeared to rely heavily on multiple sales methods such as face-to-face meetings and outbound

phone sales for generating larger sales, such as the Citi Field baseball stadium project and the

Bronx High School of Science project.  (Mittasch Dep. 49:23–50:12, 118:13–119:3.)  In addition,

prior to the APA, Adirondack's website permitted customers to purchase products directly from

the website without the involvement of a salesperson.  (Def.'s Mot. Summ. J., Ex. 13, Dep. of

Walter Pollack ("Pollack Dep."), 62:15–63:3, Feb. 20, 2013.)

        Adirondack catalogs prior to the APA listed hundreds of products, the vast majority of

which were not manufactured by KI.  (Def.'s Mot. Summ. J., Ex. 14.)  Rather, the bulk of

Adirondack's sales were non-KI products from various other manufacturers.  (Def.'s Mot.

Summ. J., Ex. 17.)   KI as a single manufacturer, however, held the largest share of Adirondack's

sales at approximately 31%.  (Pl.'s Mot. Summ. J., Ex. BBB.)  Nonetheless, at the time of the

APA, Adirondack was losing money every year.  (Olsen Dep 96:21–97:13.)  ATD was aware of

this fact when it executed the APA.  (E. Wischnia Dep. Day 1 29:7–14.)  The combined

ATD/Adirondack total sales of KI product for 2008 was $4,920,095.  (Def.'s Mot. Summ. J., Ex.

17.)  By contrast, KI had over $178 million in gross sales to end-users in 2007 (the year before

the Agreement) and $177 million in gross sales to end-users in 2008 (the first year after the Agreement).  (Def.'s Mot. Summ. J., Ex. 6.)

      **D.**      **The Asset Purchase Agreement**

      On March 1, 2008, Adirondack sold "substantially all of [its] assets that are used or useful" in the catalog division of Adirondack to Metro Office Furniture Rental, Inc.  (Pl.'s Mot. Summ. J. SS.)  KI was a "Seller-Party" as the parent of the subsidiary, Olympic Industries, Inc., which owned Adirondack.  (APA at 1.)  At present, Adirondack exists with sole function of serving as "a tenant and then a sublessor on the lease which is no longer to ATD."  (Charles Dep. 12:6–10.)  Robert Charles, Esq.—outside counsel to KI, corporate secretary of KI, and board member of Olympic Industries and Adirondack—drafted the APA on behalf of KI, Adirondack, and Olympic and signed on behalf of Olympic.  (Charles Dep. 10:2–11:5, 16:22–17:8.)  Attorney Brian MacIntyre, Esquire drafted and negotiated the APA on behalf of ATD.  (MacIntyre Dep. 10:15–23.)

      The APA defines the "Assets" that were sold, as follows:

> 4.   <u>Assets</u>.  All of the assets, properties and rights of Seller that are used or are useful in the Business as currently conducted by the Seller of every kind and description wherever located, whether or not material, whether tangible, intangible, real, personal or mixed, whether or not specifically referred to herein and whether or not carried or reflected on the books and records of Seller, but shall exclude the Excluded Assets (as defined below).  The Assets specifically include, without limitation, the following:
> > a.     All customer, prospect and mailing lists related to the Business, including but not limited to such lists attached hereto as <u>Exhibit A.4a</u>, all customer and prospect files and all business, financial and other data of or related to the Business;
> > b.     All of the current catalog inventory of the Business in stock, "on premises", or otherwise under production as of the closing (the "Current Catalogs"), which consists of no less than 3,200,000 catalogs as of the Closing Date;

      c.    All documents, records, reports, and files containing analyses and data pertaining to the Business, including but not limited to all employment records related to the Hired Employees (as defined in <u>Section A.10</u> below);

      d.    All prepayments and cash deposits of the Business as of the Closing (the "Prepayments"), including but not limited to such Prepayments set forth on <u>Exhibit A.4d</u>;

      e.    The Accounts Receivable as of the Closing as set forth on <u>Exhibit A.4e</u> (the "Closing Accounts Receivable");

      f.    All furniture, fixtures and equipment utilized in the Business, including but not limited to such computer, photocopy machines, mail machines and the like set forth on <u>Exhibit A.4.f</u>;

      g.    All prepaid postage of the Business as of the Closing;

      h.    All of the Intellectual Property of the Seller that is used or is useful in the operation of the Business, including all telephone, telex, facsimile and post office box numbers, World Wide Web uniform resource location address and electronic mail addresses of Seller used in the Business, all of the foregoing as existing immediately prior to the Closing and to the extent assignable by Seller, including but not limited to the items of Intellectual Property set forth on <u>Exhibit A.4h</u> (the "Business Intellectual Property");

      I.    All goodwill of Seller of or relating to the Business; and

      j.    All rights of Seller to other assets or property of any kind or description, tangible or intangible, where ever located, that are owned, leased or licensed by Seller that are used or are useful in the business, except for the Excluded Assets.

(APA § A.4.)  The APA also listed employees of Adirondack that were to be hired by ATD after the closing, and included titles such as Catalog Salesman, Sales Mgr./Outbound Mgr., Asst. Sales Rep./Outbound, and Outside Salesperson.[4]  (APA, Ex. 10.)  The APA went on to specifically exclude the following: "(i) cash and cash equivalents on hand as of the Closing; (ii) tax returns of Seller; (iii) any other assets owned or held by Seller and unrelated to the Business that are not included in the Assets; (iv) any assets owned or held by Parent whether or not located upon Seller's premises; and (v) the trade name 'Adirondack Rents.'" (<u>Id.</u> at 3.)

---

[4]  "Outbound" meant the Adirondack call center.  (Pl.'s Mot. Summ. J., Ex. S, Dep. of Joel Bernstein ("Bernstein Dep."), 38:8–9, Feb. 21, 2013.)  "Outside" sales referred to sales where the salesman meets face-to-face with the customer.  (Mittasch Dep. 29:15–18.)

The "Business" as sold is defined in the "Recitals" section of the APA as follows: "[t]he Seller owns all right, title and interest in and to a business engaged in the direct marketing and sales through catalogs and the Internet of furniture and office and other institutional supplies, including, but not limited to, through catalogs under the name 'Adirondack Direct' and through the domain name 'www.adirondackdirect.com' (the 'Business')."  (APA at Recitals (a).)  The Recitals of APA further state that: "[t]he Seller desires to sell to Buyer all of its right, title and interest in and to substantially all of Seller's assets that are used or are useful in the Business, and Buyer desires to purchase such assets from the Seller, all on the terms and conditions contained herein."  (APA at 1.)

The total sale price for the assets of the Business involved in the purchase was $1,522,370.92, broken down into the following:  (a) $1,272,370.92, which represented accounts receivable due and owing at the time of sale, and (b) $250,000 cash.  (APA § C.1(a) & (b).)  The parties further agreed to a specific allocation of the purchase price, as follows: closing catalogs – $170,000; prepaid postage – $60,000; goodwill – $10,000; Covenant Not to Compete – $10,000; and Accounts Receivable – remainder of purchase price.  (APA § C.2 & Ex. C.2.)

As a further condition to the consummation of the APA, the parties entered into a Supply Agreement, wherein ATD agreed to purchase $27,193,333 worth of products from KI over the five-year period from January 1, 2008 to December 31, 2012.  (APA §§  D.2(c) & D.3(c).)  The Supply Agreement, signed by both ATD and KI, defines the relevant "Transaction" as follows:

> ATD, Parent and Adirondack Chair Co., Inc. ("Adirondack"), an indirect subsidiary of Parent, are parties to an Asset Purchase Agreement dated January 31, 2008 (the "Asset Purchase Agreement") pursuant to which ATD purchased the catalog and internet sales business of Adirondack through which Adirondack offered certain products manufactured and/or supplied by Parent (the "Transaction").

12

(Def.'s Mot. Summ. J., Ex. 4 ("Supply Agreement").)  Through this Supply Agreement, ATD

committed to making certain minimum aggregate annual product purchases from KI.  (Id.)  If

ATD failed to meet the "Minimum Purchase Commitments," for any year during the minimum

commitment period, then ATD would owe KI liquidated damages, as set forth in the Supply

Agreement.[5]  (Id. § 2.c.)

> **E.      Formation of the Covenant Not to Compete as Part of the Asset Purchase
>         Agreement**

In the course of negotiating the APA, the parties agreed to the inclusion of a Covenant

Not to Compete.  (Pl.'s Mot. Summ. J., Ex. M, Dep. of Janet Wischnia ("J. Wischnia Dep.")

55:15–19, June 27, 2012.)  That provision stated:

> As a material inducement to Buyer's consummation of the transactions
> contemplated in this Agreement, none of the Seller Parties shall, during the five (5)
> years following the Closing (the "Restricted Period"), do any of the following,
> directly or indirectly, without the prior written consent of buyer in its sole discretion:
>
> a.      compete, directly or indirectly, in the Business as conducted as of the
> Closing (the "Restricted Business"), with Buyer or any of its affiliates, or any of their
> respective successors or assigns, whether now existing or hereafter created or
> acquired (collectively, the "Related Companies"), within the United States, Canada
> or Mexico (the "Restricted Area"), provided that the Seller Parties shall be permitted
> to establish and host extranet customer sites for their customers and permit such
> customers to purchase products through individual portals;
>
> b.      become interested (whether as owner, stockholder, lender, partner, co-
> venturer, director, officer, employee, agent, consultant or otherwise), directly or
> indirectly, in any entity that engages in the Restricted Business within the Restricted
> Area; provided, that Seller and Parent may own, as a passive investor, and not as part
> of a group with each other, not more than one percent (1%) of the outstanding
> securities of any class of any publicly traded securities of such entity;

---

[5]  Notably, ATD failed to make the minimum purchase commitments under the Supply
Agreement and KI is currently seeking liquidated damages via a separate proceeding.  (Pl.'s Mot.
Summ. J., Ex. CCC.)

      c.     solicit, call on, influence or induce, or attempt to solicit, call on, influence or induce, any customer, supplier or vendor, distributor, consultant, agent, or independent contractor of ATD or the Business for the purpose of terminating or curtailing any contract, arrangement or relationship with ATD or the Business; or

      d.     hire any employee of the Business or solicit, influence or induce any employee of the business to leave the employ of the Buyer.

(APA § H.7.)  The APA goes on to note that "[e]ach of Seller and Parent also acknowledges and understands that these restrictions are reasonably necessary to protect Buyer's interests, and each of Seller and Parent do not believe that such restrictions will prevent it from conducting businesses that are not excluded from the Restricted Business during the Restricted Period in the Restricted Area."  (APA § H.8(d).)  The "Seller Parties" identified in the Covenant Not to Compete include KI, Adirondack, and Olympic.  (APA at p. 1.)

     As indicated above, out of the over $1.5 million dollar purchase price, the allocated value of the Covenant Not to Compete was $10,000.  (APA § B & Ex. C.2.)  Attorney MacIntyre testified that the $10,000 value of the Covenant Not to Compete was agreed to by the parties and was deemed to be the fair market value for whatever it was that KI was giving up in the noncompete.  (Def.'s Mot.  Summ. J., Ex. 7, Dep. of Bryan MacIntyre ("MacIntyre Dep."), 68:2–15, 198:22–199:2, June 4, 2012.)

     Plaintiff contends that it had no idea that KI was selling products to end-user customers prior to and at the closing of the APA.  Specifically, Eric Wischnia, ATD Vice-President and head of its furniture operations, testified as follows:

Q.     Were you ever asked an opinion about the working of the Covenant Not to Compete?
A.     Yes.
Q.     Before it was signed?
A.     Before it was signed, yes.

14

Q.    Can you tell me about that, what you were asked about?

A.    I was asked about the general document. I read that. I know that I read the noncompete and I felt that it was solid, broad. It encompassed everything that we wanted it to encompass.

. . .

Q.    Are you aware as you sit here today of anyone from ATD at any time during the negotiations of those Agreements asking KI whether KI sold direct to end users?

A.    Well, in effect, we knew that KI sold direct to end users through Adirondack.

Q.    Okay. Are you aware of anyone asking KI whether they sold direct outside the scope of Adirondack?

A.    No.

Q.    So [a]s far as you know that didn't happen?

A.    I believe I'm certain that it did not happen.

(Def.'s Mot. Summ. J., Ex. 2, Dep. of Eric Wischnia ("E. Wischnia Dep. Day 1"), 154:4–156:2.)

Neither Mr. Olsen nor Mr. Charles could immediately identify documents produced in due diligence that indicated that KI had a call center.  (Olsen Dep. 100:22–101:9; Charles Dep. 39:1–9.)  Defendant admits that it did not have conversations with ATD regarding sales to end-users, as this was not a subject of the Asset Purchase or Supply Agreements, and was not raised by either KI or ATD.  (Def.'s Resp. Opp'n Mot. Summ. J. ¶ 61.)  Nonetheless, KI claimed to have produced a document indicating that it made over $178 million in gross sales to end-users in 2007—the year before the APA—which was in addition to and separate from sales made by Adirondack.[6]  (Def.'s Mot. Summ. J., Ex. 6.)

Mr. Charles testified that the Covenant Not to Compete was

[I]ntended and worded to avoid the Olympic—KI and its subsidiaries were not going to be a catalog business anymore.  But as the agreement reflects, KI was not in the ADCO catalog business anyway nor was Olympic.  It was an indirect operation.  So when KI is agreeing to this, it's not saying I won't compete indirectly or directly with the business.  It's saying—it's a structural question.  I'm not going to form another

---

[6]  The term end-user is not defined in either the APA or the Covenant Not to Compete. (MacIntyre Dep. 42:221–23, E. Wischnia Dep. Day 1 103:1–18.)

subsidiary.  I'm not going to do this as I did on the day before closing indirectly.

(Charles Dep. 115:18–116:4.)  Mr. Olsen further explained that his understanding of competition

would be if "Adirondack would the next day go out and print up a bunch of catalogs and begin to

mail them to the general public to compete."  (Olsen Dep.  112:11–13.)

    Under the APA, Adirondack sold "Accounts Receivable" to ATD, but only those "solely

with respect to the 'Business.'" (APA § A.3.)  Among those Accounts Receivable were several

phone and outside/face-to-face sales.  (Pl.'s Mot. Summ. J., Ex. T.)[7]  Similarly, under the APA,

ATD agreed to assume certain liabilities of Adirondack.  (APA § B.2.)  More precisely, it stated

that "Buyer shall assume responsibility for and liability to satisfy only: (a) such open, unfilled,

and not entered catalog orders (i.e., backlog) of the business."  (Id.)  These "not entered catalog

orders (i.e., backlog) of the 'Business'" appear to include both outside sales and phone sales.

(Pl.'s Mot. Summ. J., Ex. T.)  Plaintiff now contends that because such assets were sold in

connection with the APA and were part of the "Restricted Business," the performance of any

such sales were a violation of the APA.  Defendant, of course, disputes this interpretation.

### F.     Alleged Breach of the Covenant Not to Compete

#### 1.     KI's Alleged Competition in the "Business"

    Since 2008, KI has sold $784, 277,469 worth of products to end-user customers.  (Def.'s

Mot. Summ. J., Ex. 6.)  These sales have been made exclusively in United States, Canada, and

Mexico, which constitutes the "Restricted Area" under the Covenant Not to Compete.  (Id.)  The

KI inside sales force sells nothing but KI products and there are no non-KI products on KI's

---

    [7] The Court takes note of Defendant's objection to this exhibit, (Def.'s Answer Mot. Summ. J. ¶ 99), but finds no contrary proof that there was a complete absence of accounts receivable attributable to phone or outside sales.

website, or in its marketing brochure.  (Pl.'s Mot. Summ. J., Ex. X, Dep. of Brian Tischer

("Tischer Dep.") 51:24–53:11, July 19, 2012.)

 KI refers to its sales strategy as the "Go-to-Market Strategy."  (Pl.'s Mot. Summ. J., Ex.

W, Dep. of Richard Butrym ("Butrym Dep."), 15:6–18, Nov. 13, 2012.)  The objective of this

"Go-to-Market Strategy" is for KI to reach out to end-user decision-makers and "ask how they

want to purchase or procure" KI products.  (Id. at 15:6–18.)  While the number one strategy is to

reach out to end-users directly, KI works with dealers and distributors—such as ATD and

Adirondack—when necessary to gain access to end user customers.  (Id. at 27:3–18.)  To reach

these customers, multiple KI inside sales people (numbering somewhere from forty to forty-six)

call end-user customers from the KI call center in Green Bay, Wisconsin.  (Id. at 202:7–14.)

Brian Tischer, the KI Manager of Integrated Sales, testified that KI employees cold-call

customers for the purpose of securing sales.  (Tischer Dep. 12:3–12.)  He further explained that

KI uses an outside sales force of approximately 142 field representatives to hold face-to-face

meetings with end-user customers to market and sell furniture and other institutional supplies.

(Id. at 12:24–13:4.)  The outside sales force is organized into twenty-six national districts, with

fourteen staffed by KI employees and twelve staffed by independent manufacturer's

representatives who serve the same function and hold the same titles as the direct KI employees,

with the head of each district being the district leader.  (Butrym Dep. 87:15–88:25.)  Together,

these twenty-six districts sell to end-user customers.  (Id. at 95:1–9.)  KI also works with sixty-

eight "dealer representatives" which have contracts with KI to sell products.  (Id. at 79:13–17.)

95 to 100% of KI's sales leads come from professional lead sources and from KI field sales

people, who research at the local level.  (Krenke Dep. 135:16–136:22.)

KI has admitted that it competed with Adirondack prior to the APA, and has competed against ATD and Adirondack (as owned by ATD) subsequent to the APA.  (Pl.'s Mot. Summ. J., Ex. D., Dep. of Brian Krenke ("Krenke Dep."), 78:9–80:8, Nov. 15, 2012.)  Indeed, it has conceded that KI competes in the same markets with the same products as ATD.  (Butrym Dep. 58:17–21.)  KI denies, however, that any of this competition is in violation of the Covenant Not to Compete since the sales are not performed through either catalogs or the Internet.

### a.    KI's Use of Catalogs

In addition to selling over the phone and through face-to-face meetings, KI prints informational brochures.  (Pl.'s Mot. Summ. J., Exs. Y, Z, AA.)  Plaintiff argues that these "catalogs" are directed towards KI's core markets—education, healthcare, government, and business.  (Id.)  All three catalogs contain KI products, photographs of the KI product line, product descriptions and product options.  (Pl.'s Mot. Summ. J., Exs. Y, Z, and AA.)   The Business Catalog provides a web address and the following directions:

> Internet Answers
> Here's the perfect solution for all your business furniture needs: kibusiness.com.  Get what you need.  Get it fast.  Get it all at one easy-to-navigate address.
> • Design your way.  Full-color furniture selections with information product copy.  Content logically organized with new tools for the way you work.
> • Make it happen.  You can use the KI website any way you want—it's an inspirational, virtual library.  Find.  Spec.  Deliver.
> • View furniture by collection and application.  KI's innovative business furniture is now conveniently grouped and cross-referenced by collection and application to make your job easy.
> Detailed Product Information
> Product detail pages are filled with high-quality images, product dimensions, finish options, and links to PDF brochures and up-to-date price lists.

(Pl.'s Mot. Summ. J., Ex. AA.)  The catalogs of KI products are available both in paper form, and online though the KI website at http://www.kigovernment.com.  (Pl.'s Mot. Summ. J., Exs.

TT, UU, VV.)  The catalogs instruct end-users to go to the website and click "Request Quote" to

engage a member of the KI team to assist them with their projects.  (See, e.g., Pl.'s Mot. Summ.

J., Ex. Y.)

Plaintiff and Defendant have differing versions of how these catalogs are used in KI's

business.  Plaintiff contends that the catalogs are utilized by KI during phone sales and face-to-

face sales.  (Butrym Dep. at 107:3–17, 116:11–24; Tischer Dep. 68:16–20.)  They are mailed by

outside sales representatives to potential customers and then left behind with the customer after

in-person visits.  (Id.)  In addition, KI frequently sends out catalogs to targeted customers

promoting its products.  (Butrym Dep. 116:11–24.)  Finally, after potential large prospect

customers or prospects are contacted, KI sends them marketing materials that show the KI

product line that may contain products that the potential customer may want to buy.  (Tischer

Dep. 68:16–20.)  Once the customers have the catalogs, the KI sales specialist uses them during

phone interactions with the customers.  (Pl.'s Mot. Summ. J., Ex. BB, Dep. of Michael Curtis

("Curtis Dep."), 29:14–24, Jan. 30, 2013.)  During the five-year non-compete period at issue in

this case, KI printed the following number of catalogs: 2008—27,500; 2009—43,500;

2010—50,000; 2011—20,000; and 2012—15,000.  (Pl.'s Mot. Summ. J., Ex. G.)

KI, on the other hand, characterizes the purported catalogs as "informational brochures."

It argues that it prints a limited number of these brochures—on average, 30,000 per year of five

different types—and mails them only upon request.  Joe Burkard, KI's Vice President of

Corporate Communications, explained that KI did not send out catalogs to potential end-user

customers without a request from either the customer or from a sales representative.  (KI Mot.

Summ. J., Ex. 25, Dep. of Joe Burkard ("Burkard Dep."), 42:14–44:12, January 31, 2008.)  KI

would only send marketing materials to prospects after they were contacted.  (Tischer Dep.

67:4–69:7.)  KI's catalog marketing and sales practices did not change as a result of the APA

because KI, as a separate entity, did not have a catalog.  (Id. at 124:18–24, 125:20–126:9.)

Indeed, KI does not consider any sales to be "catalog" sales as it did not utilize or mail catalogs

to generate sales, like Adirondack did in January 2008.  (Butrym Dep. 132:21–22; Def.'s Mot.

Summ. J., Ex. 28, Expert Report of Robert Borders ("Borders Report").)  Rather, the

informational brochures at issue did not have order forms, pricing, toll free numbers/fax

numbers/website solicitations to order products, and did not solicit sales in an immediate way.

(Borders Report.)  This is in stark contract to Adirondack's catalogs, of which 8.6 million were

set to be mailed out in 2007, and which have order forms, contain prices, have phone/fax

numbers and websites, and solicit sales in an immediate way.  (Def.'s Mot. Summ. J., Exs. 9 &

14; Borders Report at 22, 29.)

### b.      KI's Use of Its Website

ATD also contends that KI uses its website in the same manner it uses is catalogs, with

inside sales specialists speaking with a customer by phone while both are looking at the website,

browsing, and discussing products and options.  Specifically, an inside sales specialist would

take a customer online and walk them through a specific area, show them exact products, and

answer any questions they would have on them.  (Curtis Dep. 30:3–19.)  KI admitted that the

website is used as a marketing and sales tool where it could complete a sale because of

discussions about the products on the website.  (Id.)  The landing page for www.KI.com provides

"price lists," "Brochures and Product Info," and information on the "KI Ordering Process."  (Pl.'s

Mot. Summ. J., Ex. UU.)  Although the website directs customers to a sales representative, (Pl.'s

20

Mot. Summ. J., Ex. TT), it does not require a customer to interact with a sales representative and

instructs customers to submit orders by, e-mail, fax, and mail.  (Pl.'s Mot. Summ. J., Ex. UU.)

KI also uses a "Quick Ship Program," wherein orders can be placed via fax, email, or phone and

products available are shipped within ten working days from the order.  (Pl.'s Mot. Summ. J.,

Exs. DD, EE.)  The Quick Ship Price List includes a Purchase Order Cover Sheet and is

accessible to end-user customers through the Internet or in print form.  (Pl.'s Mot. Summ. J., Exs.

DD, EE, FF.)

      KI again disagrees with ATD's characterization of its website use.  KI acknowledges that

it has a website on which it shows product information.  (Tischer Dep. 56:16–21.)  It denies,

however, that it has an Internet sales process whereby sales can be made on the website.  (Krenke

Dep. 119:20–25; Tischer Dep. 13:10–16.)  Specifically, it notes that its website does not contain

a "cart" for purchasing items, a means by which to purchase products, any "calls to action," or

any products listed with pricing for each item.  (Borders Report at pp. 32, 35–36.)  According to

KI, it has not made a single sale through the Internet since the APA was signed.  (Def.'s Mot.

Summ. J., Ex. 31, Resp. to Interrog. No. 5.)

      **2.**      **<u>KI's Alleged Interest in Competitive Businesses</u>**

      As set forth above, paragraph (b) of the Covenant Not to Compete prohibits KI from

"becom[ing] interested (whether as owner, stockholder, lender, partner, co-venturer, director,

officer, employee, agent, consultant or otherwise), directly or indirectly, in any entity that

engages in the Restricted Business with the Restricted Area; provided, that Seller and Parent may

own, as a passive investor, and not as part of a group with each other, not more than one percent

(1%) of the outstanding securities of any class of any publicly traded securities of such entity."

(APA § H.7(b).)  ATD asserts that KI has breached this provision.

 As part of its "Go-To-Market" strategy, KI has sixty-eight dealer representatives which have contracts with KI to sell KI products to end-user customers.  (Butrym Dep. 79:13–17.)  KI helps these "dealer representatives" develop business plans, trains them, and provides them with qualified leads.  (Id. at 71:2–18, 83:7–18, 84:23–25.)  In return, 70% of the dealer representatives' sales must be KI products.  (Id. at 66:13–68:17.)  KI also works with "manufacturer's representatives," advises such representatives of KI's marketing strategies, and provides them with KI catalogs to distribute to customers.  (Id. at 87:15–88:25, 5:1–9, 97:24–98:21.)  KI places no restrictions upon either "dealer representatives" or "manufacturer's representatives" as to how or to what customers they sell or solicit.  (Id. at 177:13–178:5.)  Current Vice-president of Sales at KI, Richard Butrym, testified that he was unaware of any restrictions placed on sales specialists, manufacturer's representatives, or dealer representatives in terms of their ability to market, solicit, and sell to customers as a result of the noncompete of the APA.  (Id.)  Based on these relationships, ATD argues that KI is interested as a partner, co-venturer, consultant, or otherwise, directly or indirectly, in its twelve independent manufacturer's representatives and sixty-eight dealer representatives.  KI, on the other hand, contends that there is no evidence that KI is "interested" in any of these entities.

### 3.  KI's Alleged Solicitation of Customers of ATD and Adirondack

 As explained above, the Covenant Not to Compete also provides that KI shall not, "solicit, call on, influence, or induce, or attempt to solicit, call on, influence or induce, any customer, supplier, or vendor, distributor, consultant, agent or independent contractor of ATD or the Business for the purpose of terminating or curtailing any contract, arrangement or

relationship with ATD or the business."  (APA § H.7(c).)  Mr. Butrym indicated that KI's sales

force works diligently to solicit as many end-user customers as follows.  (Butrym Dep.

48:24–49:10.)  KI further admits that it places no restriction on members of its sales organization

from selling or soliciting to customers of ATD or Adirondack.  (Id. at 178:1–5.)  KI sales

associates are provided with scripted questions to ask potential customers and are tested on their

ability to solicit customers.  (Pl.'s Mot. Summ. J., Exs. LL, MM.)  Ultimately, KI places great

emphasis on forming relationships with customers, (Butrym Dep. 137:20–139:2), and a tag line

in KI's sales organization is to be "trusted advisor."  (Tischer Dep. 94:8–24.)  Accordingly, as a

company strategy, KI solicits as many end-users as possible, even those who may be customers

of ATD or Adirondack.  (Butrym Dep. 48:24–49:10; Def.'s Resp. to Pl.'s Statement of

Undisputed Facts ¶ 210.)  Plaintiff believes this to be a violation of the Covenant Not to

Compete, whereas Defendant denies that this is the case.

### G.   Alleged Harm to ATD and Adirondack from KI's Competition

The parties agree that Adirondack's sales have plummeted since the APA was executed.

In 2007, Adirondack sold $26,129,125 of product, (Pl.'s Mot. Summ. J., Ex. V at 4), whereas by

2012, Adirondack sales had fallen to $4,533,114.  (Pl.'s Mot. Summ. J., Ex. PP; Def.'s Resp. to

Pl.'s Statement of Undisputed Facts ¶ 213.)  Notably, however, much of this loss in sales was

unrelated to sales of KI products.  (Def.'s Mot. Summ. J., Exs. 17 & 39.)  ATD sales have

similarly suffered, although not to the same extent.  (Pl.'s Statement Undisputed Facts ¶ 214;

Def.'s Resp. to Pl.'s Statement of Undisputed Facts ¶ 214.)  ATD attributes these losses to KI's

violation of the Covenant Not to Compete.

H.    **Procedural History**

ATD commenced this litigation with two separate complaints on January 4, 2012. Following adjudication of Plaintiff's Motion for Preliminary Injunction and Defendant's Motion to Dismiss, Plaintiff filed an Amended Complaint consolidating its causes of action and setting forth eleven Counts as follows: (1) breach of the covenant not to compete—damages; (2) breach of the covenant not to compete—injunction; (3) breach of the confidentiality provision of the Asset Purchase Agreement—damages; (4) breach of the confidentiality provision of the Asset Purchase Agreement—injunction; (5) breach of the confidentiality provision of the Supply Agreement—injunction; (6) irreparable harm, inadequate remedy for money damages, inadequate remedy at law—injunction; (7) harm/hardship—injunction; (8) public interest; (9) fraudulent inducement—damages; (10) relief sought—injunctive relief; (11) relief sought—damages.  By way of Stipulation, Plaintiff agreed to dismiss Count IX for fraudulent inducement.

Both parties filed Motions for Summary Judgment on May 17, 2013 and responses to the opposing Motion for Summary Judgment on June 17, 2013.  Defendant submitted a Reply Brief on June 28, 2013, while Plaintiff filed its Reply Brief on July 10, 2013.  Defendant then submitted a Sur-reply Brief on July 26, 2013 and Plaintiff filed a Sur-reply Brief on August 20, 2013.  As the briefing process has been thoroughly exhausted, the Motions for Summary Judgment are now ripe for judicial consideration.

II.    **STANDARD OF REVIEW**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is

24

"material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to

return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence

that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv.

Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the

disputed evidence and decide which is more probative, or to make credibility determinations.

Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA

Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court

must consider the evidence, and all reasonable inferences which may be drawn from it, in the

light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg

Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact,

it need not "support its motion with affidavits or other similar materials negating the opponent's

claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing

out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at

325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden at trial,"

summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of

some evidence in support of the non-movant will not be adequate to support a denial of a motion

for summary judgment; there must be enough evidence to enable a jury to reasonably find for the

non-movant on that issue.  Anderson, 477 U.S. at 249–50.

Notably, these summary judgment rules do not apply any differently where there are cross-motions pending.  Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008).  As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'"  Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.   DISCUSSION

Both parties presently seek summary judgment on the breach of contract action, alleging that the case must be resolved in their favor on issues of contract interpretation, breach, and damages.  In the event that the Court declines to interpret the contract as a matter of law, both parties offer alternative theories of recovery.

In accordance with these arguments, the Court first addresses the threshold issue of interpretation of the highly-disputed Covenant Not to Compete.  As the record reveals that Covenant to be ambiguous, and thus incapable of definitive interpretation on summary judgment review, the Court then turns to the two alternative arguments put forth by the parties: (1) Plaintiff's claim for recovery under New York's Mohawk doctrine and (2) Defendant's claim that no meeting of the minds occurred, thus requiring the Covenant to be severed from the APA.

A.      **Interpretation of the Covenant Not to Compete**[8]

1.      **Standard for Interpreting an Insurance Contract**

Under New York law,[9] contracts must be construed to give effect to the intent of the

parties as expressed in the plain language of the contract.  Morgan Stanley Grp., Inc. v. New

England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000).  When the contract language is wholly

unambiguous, summary judgment is appropriate.  Compagnie Financiere de CIC et de L'Union

Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 157 (2d Cir. 2000).

"The question of whether the language of a contract is clear or ambiguous is a question of law to

be decided by the court."  Id. at 158.  Where, however, the language is ambiguous, the contract's

meaning becomes an issue of fact that precludes summary judgment.  Sayers v. Rochester Tel.

Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993).  "Contract language

is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably

intelligent person who has examined the context of the entire integrated agreement and who

cognizant of customs, practices, usages and terminology as generally understood in the particular

trade or business."  Id. at 1095 (citation omitted).  At the summary judgment stage, "[t]he mere

assertion of an ambiguity does not suffice to make an issue of fact."  Thompson v. Gjivoje, 896

F.2d 716, 721 (2d Cir. 1990).  "Thus, the court should not find a contract ambiguous where the

interpretation urged by one party would 'strain[] the contract language beyond its reasonable and

_____

[8] ATD devotes a section of its Memorandum in Support of its Motion for Summary Judgment to argue that the Covenant Not to Compete should be enforced and that the restricted area and restricted period set forth in that Covenant are reasonable.  KI does not argue to the contrary and, as such, the Court not delve into a discussion of these issues.

[9] Both parties agree that New York law governs the APA and Covenant at issue in this case.

ordinary meaning.'"  Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (quoting Bethlehem Steel Co. v. Turner Constr. Co., 141 N.E.2d 590 (N.Y. 1957) (alteration in original)).

Notwithstanding the principle that an ambiguous contract is generally a question of fact to be interpreted by a factfinder, summary judgment may still be appropriate where the court may resolve the ambiguity through legal, rather than factual, construction of the contract terms.  Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999).  In the case of an ambiguous contract, the parties may present extrinsic evidence of their actual intent. Id.  If the extrinsic evidence is "so one-sided that no reasonable person could decide the contrary," the court may resolve the ambiguity as a matter of law.  3M Corp. v. Banco Carolina Steel Corp., 171 F.3d 739, 746–47 (2d Cir. 1999) (internal quotations omitted).  If not, the extrinsic evidence must be interpreted by a factfinder.  Id.; see also Williams & Sons Erectors, Inc. v. S. Carolina Steel Corp., 983 F.2d 1176, 1183–84 (2d Cir. 1993).

## 2.     Plain Meaning of the Covenant

The parties in this case urge two completely different interpretations of the Covenant Not to Compete.  ATD ascribes broad meaning to this provision and asserts that the Covenant was intended to restrict all competition by KI with ATD.  In support of this construction, it first notes that the Covenant uses the terms "directly or indirectly," which creates a comprehensive prohibition against competition.  Second, it claims that the Covenant explicitly prohibits KI from competing with ATD in the "Business" "as conducted" as of the time of the closing.  Because "[t]he Business as conducted as of the Closing" is not defined in the APA, proper interpretation requires consideration of how the catalog division of Adirondack actually conducted the Business

28

as of January 31, 2008.  The evidence on that point, according to ATD, reveals that when the

catalog division of Adirondack was part of KI, it sold furniture through direct mail

marketing/catalogs, outbound call centers/telephones, outside sales/face-to-face sales meetings,

and the Internet.  Indeed, ATD purchased all of the telephones, computers, fax machines, and e-

mail domain names of Adirondack.  Therefore, according to Plaintiff, the "Restricted Business"

equates to and describes the catalog division of Adirondack and how it did business, which was

to sell through catalogs and Internet using all manner and channels of communications and sales

techniques.  If all of Adirondack's transactions were by mail order catalog forms and online

purchases, then ATD would have only purchased catalogs and the website, rather than the

complete assets and staff of a functioning business that did direct marketing and sales through all

manner and channels of communications.[10]  In turn, ATD concludes that all KI sales to end-user

customers of Adirondack are prohibited by the Covenant.

    KI, on the other hand, urges a far more restrictive interpretation.  Reading both section

---

[10]  Plaintiff offers Ms. Ruth Stevens as a direct marketing expert and Defendant presently
seeks to preclude her as an expert under Daubert standards.  Although Plaintiff avers that Ms.
Stevens does not attempt to interpret the Covenant or the APA, the Court notes that she does
offer her opinions as to the meaning of certain terms within the contracts.  (See Pl.'s Mot. Summ.
J., Ex. LLL at 13 ("Accordingly, when I read 'a business engaged in the direct marketing and
sales through catalogs and the internet' in the recitals, I immediately pictured a multi-channel
marketing and sales organization.'").)
    To the extent Ms. Stevens opines as to contract interpretation or her opinion as to the
meaning of certain terms within the contracts, the Court shall not consider her opinion on
summary judgment review.  Contract interpretation is not the function of an expert and to allow
it would usurp the legal role of the court.  See Brill v. Marandola, 540 F. Supp. 2d 563, 570 (E.D.
Pa. 2008); Adani Exports Ltd. v. AMCI (Export) Co., No. Civ.A.05-304, 2008 WL 4925647, at
*5 (W.D. Pa. Nov. 14, 2008).  To the extent Ms. Stevens seeks to use her expertise in the direct
marketing area to opine on how Adirondack conducted the Business as of the closing, the Court
shall not rule on the admissibility of such testimony at this stage of the case.  Defendant may
renew this Motion to Preclude in the form of a properly filed Motion in Limine filed prior to trial.

H.7(a) of the Covenant Not to Compete and the definition of "Business" from the Recitals, KI argues that there is no blanket restriction on furniture sales to "end-users" or consumers.  Indeed, the term "end-users" does not appear within the Covenant.  Thus, KI asserts that although the Covenant language contained restrictions, such restrictions were not a restraint on KI's ability to sell to end-users generally.  Otherwise, the clause would have said that KI agreed not to sell to end-users and that KI agreed not to compete by any method of direct marketing and sales.  Rather, the Covenant stated that it was a restriction on competing in the Business as conducted at the Closing—*i.e.* the "Restricted Business"—which was a Business engaged in direct marketing and sale through catalogs and the Internet.  KI goes on to note that this interpretation is reinforced by § H.8(d) of the APA, which states that "Each of Seller and Parent also acknowledge that these restrictions [set forth in §§ H.6 and H.7] are reasonably necessary to protect Buyer's interest, and each of Seller and Parent do not believe that such restrictions will prevent it from conducting businesses that are not excluded from the Restricted Business during the Restricted Period in the Restricted Area."  (APA § H.8(d).)  KI asserts that this provision clearly reveals that all parties were aware that KI had other businesses, and could continue to conduct them.  Overall, it concludes that the four corners of the contract do not address themselves to a broad restriction on sales to end-users.

Faced with such drastically divergent readings, the Court now confronts the arduous task of attempting to ascribe meaning to the Covenant's provisions.  As such, the Court first looks to the plain language of the contested provisions.  In doing so, several principles constrain our interpretation.  "Where possible, a contract should be read to avoid inconsistencies and to give meaning to all of its provisions, giving a practical and reasonable interpretation to the language

employed and the parties' reasonable expectations with respect thereto." Malleolo v. Malleolo,

731 N.Y.S.2d 752, 752 (N.Y. App. Div. 2001).  Therefore, "a court should not adopt an

interpretation which would leave any provision without force and effect" Gonzalez v. Norrito,

682 N.Y.S.2d 100, 101 (N.Y. App. Div. 1998).  When a contract contains a provision subject to

several interpretations, the interpretation that gives effective and lawful meaning to all the terms

of the contract is preferred over one which leaves a portion of the contract meaningless or

unlawful.  Restatement (Second) of Contracts § 203(a); Galli v. Metz, 973 F.2d 145, 149 (2d Cir.

1992); Eastman Kodak Co. v. STWB Inc., 232 F. Supp. 2d 74, 91 (S.D.N.Y. 2002).  "A court

may not write into a contract conditions the parties did not include by adding or excising terms

under the guise of construction, nor may it construe the language in such a way as would distort

the contract's apparent meaning." Petracca v. Petracca, 756 N.Y.S.2d 587, 588–89 (N.Y. App.

Div. 2003).  Moreover, "[a] contract should not be interpreted to produce a result that is absurd,

commercially unreasonable . . . or contrary to the reasonable expectations of the parties." Lipper

Holdings, LLC v. Trident Holdings, LLC, 766 N.Y.S.2d 561 (N.Y. App. Div. 2003) (internal

citations omitted).

     As set forth above, the Covenant Not to Compete states, in pertinent part, as follows:

> As a material inducement to Buyer's consummation of the transactions
> contemplated in this Agreement, none of the Seller Parties shall, during the five
> (5) years following the Closing (the "Restricted Period"), do any of the following,
> directly or indirectly, without the prior written consent of buyer in its sole
> discretion:

> a.    compete, directly or indirectly, in the Business as conducted as of the
> Closing (the "Restricted Business"), with Buyer or any of its affiliates, or any of
> their respective successors or assigns, whether now existing or hereafter created or
> acquired (collectively, the "Related Companies"), with the United States, Canada

or Mexico (the "Restricted Area"), provided that the Seller Parties shall be permitted to establish and host extranet customer sites for their customers and permit such customers to purchase products through individual portals;

(APA § H.7(a).)   Plainly read, this portion of the Covenant precludes KI from competing with ATD in the "Restricted Business" for a five-year period in the United States, Canada, and Mexico.

This plain reading, however, requires the Court to more closely examine the meaning of both "Business" and "Restricted Business." The "Business" is defined in the "Recitals" section of the APA as follows: "[t]he Seller owns all right, title and interest in and to a business engaged in the direct marketing and sales through catalogs and the Internet of furniture and office and other institutional supplies, including, but not limited to, through catalogs under the name "Adirondack Direct" and through the domain name 'www.adirondackdirect.com' (the 'Business')." (APA at Recitals (a).) The "Restricted Business" is the means in which that "Business" was conducted at the time of closing. (APA § H.7(a).)

Finally, the Court looks to the intention of the APA as defined in the four corners of the document. The Recitals state that "[t]he Seller desires to sell to Buyer all of its right, title and interest in and to substantially all of the Seller's assets that are used or are useful in the Business, and Buyer desires to purchase such assets from the Seller on the terms and conditions contained herein." (APA at 1.) The "Assets" that were sold included customer, prospect and mailing lists; the current catalog inventory of the business in stock; documents containing analyses and data pertaining to the Business; all prepayments and cash deposits of the business as of the Closing; accounts receivable as of the closing; all furniture, fixtures, and equipment utilized in the

32

Business; all prepaid postage of the Business; all intellectual property of the seller that was used

or useful in the operation of the Business; all goodwill of Seller relating to the Business; and "all

rights of Seller to other assets or property of any kind or description, tangible or intangible,

where ever located, that are owned, leased or licensed by Seller that are used or are useful in the

Business, except for the Excluded Assets."  (APA at p. 2.)

    Giving meaning to all of the relevant provisions of the Covenant and the APA, the Court

finds the Covenant Not to Compete to be unavoidably ambiguous on is face.  The definition of

"Business"—"a business engaged in the direct marketing and sales through catalogs and the

Internet of furniture and office and other institutional supplies, including, but not limited to,

through catalogs under the name "Adirondack Direct" and through the domain name

'www.adirondackdirect.com' (the 'Business')"[11]—indicates that the "Business" at issue is one

that markets and sells its products only through catalogs and the Internet.  To read this definition

to include all types of sales—including those done through telephone/call centers and outside

sales/face-to-face meetings—would make superfluous the inclusion of the phrase "engaged in the

direct marketing and sales through catalogs and the Internet."  Certainly, if the parties had meant

---

    [11]  ATD argues that the phrase "including, but not limited to" modifies the phrase "a business engaged in the direct marketing and sales" and suggests that the parties' intended to define the "Business" expansively.  The Court disagrees.  The "Business" is clearly defined as "a business engaged in the direct marketing and sales through catalogs and the Internet of furniture and office and other institutional supplies."  The subsequent phrase, "including, but not limited to, through catalogs under the name 'Adirondack Direct' and through the domain name 'www.adirondackdirect.com'" modifies the phrase, "engaged in the direct marketing and sales through catalogs and the Internet of furniture."  In other words, one way that Adirondack conducts its marketing and sales through catalogs and the Internet is through the name "Adirondack Direct" and the domain name "www.adirondackdirect.com."  The phrase in question does not modify how Adirondack Direct generally does business.

33

to include all types of sales, the provision would have simply read "a business engaged in the marketing and sales of furniture and office and other institutional supplies."[12]  Moreover, it is notable that the Covenant only prohibits KI's direct or indirect competition "in" the "Restricted Business."  It does not, as ATD suggests, create a blanket prohibition on KI's competition generally "with" ATD or Adirondack.  As such, the Covenant clearly meant to narrow the scope of competition precluded by the Agreement.

The discussion, however, does not stop at this point.  The Covenant does not simply prohibit KI from competing in the "Business" as defined.  Rather, it prohibits KI from competing "directly or indirectly" in the "Restricted Business."  This language then begs two questions: (1) what is the "Restricted Business" and (2) what is "indirect" competition in such business.

---

[12]  ATD argues that the APA required ATD to assume certain liabilities of Adirondack, including open and unfilled "not entered catalog orders," which includes outside sales team orders and phone orders.  (Pl.'s Mem. Supp. Mot. Summ. J. 14 (citing APA at Ex. B.2, at p.3 & 5.)  Accordingly, it reasons that the parties used the terms "catalog orders" of the Business to describe all methods of sales, including face-to-face sales and telephone sales.  Moreover, it notes that KI sold to ATD "Accounts Receivable," which logically were "solely with respect to the 'Business.'"  To the extent those Accounts Receivable included "outside sales" and "phone" sales, ATD contends that it is logical that "Business" meant sales by any means.  Finally, ATD asserts that by selling telephones and lists of employees who performed outside sales, the parties intended to include such types of sales in the "Business."

These arguments are of no moment in the Court's review of the APA, as they require broad inferences based on tenuous interpretations of why certain items were included in the sale.  Nothing in the plain language of the APA suggests that "catalog" sales means sales accomplished through any and all means.  To the extent the Accounts Receivable and open and unfilled "not entered catalog orders" may have included sales made by phone or face-to-face meetings, such evidence does not in any way purport to modify the plain language of the APA, which describes the "Business" as marketing and selling through catalogs and the Internet.  Moreover, the evidence offered by ATD mandates that the Court look beyond the four corners of the language in the APA, which is not appropriate upon plain language review.  Finally, the sale of telephones and employees who used to perform outside sales does not dictate that those employees must be used in the same way or otherwise change the explicit language of the contract.

"Restricted Business" is defined only as how the "Business [i]s conducted as of the Closing."
The APA, however, is devoid of any description of how the Adirondack catalog
division—ostensibly the "Business" at issue—was conducted at the time of closing.  Although
the Recitals of the APA make it clear that that business was engaged in sales through catalogs
and the Internet, it is unclear whether the actual practice of the business was to market and sell by
other means.  As the APA and Covenant provide no means by which this crucial term may be
defined, the Court cannot interpret it without resort to extrinsic evidence.  Moreover, even
assuming *arguendo* that the term "Restricted Business" had the same definition as the term
"Business"—a reading requiring the Court to render a term meaningless—the use of the term
"indirectly" to modify the restriction on KI's competition creates a new ambiguity.  Even though
Adirondack technically was a business engaged in marketing and sales of its products to
customers through catalogs and the Internet, would KI's marketing and sales of the same
products to the same customers constitute an "indirect" form of competition covered by the
Covenant Not to Compete?[13]

In short, the Court must find that the plain language of the Covenant Not to Compete at
issue is ambiguous on its face.  To accept Plaintiff's reading would require the Court to disregard
the definition of "Business," which is described as an entity engaging in direct marketing and

---

[13]  KI asks this Court to, at minimum, hold that the language of the Covenant does not
include all sales to "end-users," since that term is neither used nor defined anywhere in the APA
or Covenant.  This is nonsensical.  Neither party disputes that Adirondack, i.e., the "Business,"
made sales to end-users and that sales by KI to end-users were, in some respect, limited by the
Covenant. (See Def.'s Mem. Supp. Mot. Summ. J., 15 n.6.)  The only question is whether all of
KI's sales to end-users were prohibited or only those sales made through catalogs and the
Internet.

sales of certain products *through catalogs and over the Internet*.  To accept Defendant's reading, however, would require the Court to disregard the Covenant's restriction on *direct or indirect* competition in the *Restricted* Business.  As the contract language is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement, the Court deems the Covenant ambiguous and declines to adopt either reading as the appropriate meaning of the Covenant.

### 3.     Extrinsic Evidence of the Parties' Intent

If the language of a contract is ambiguous, extrinsic evidence of the parties' intent is admissible.  Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992). The primary objective in contract construction is "'to give effect to the intent of the [contracting] parties as revealed by the language they chose to use.'"  Bourne v. Walt Disney Co., 68 F.3d 621, 629 (2d Cir.1995) (quoting Seiden, 959 F.2d at 428), cert. denied, 517 U.S. 1240 (1996).  A court may resolve the ambiguity as a matter of law only where "there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation."[14] Collins v. Harrison–Bode, 303 F.3d 429, 433 (2d Cir. 2002) (citation omitted).  If such evidence presents issues of credibility or a choice among reasonable inferences, the intent of the parties is for the trier of fact.  Morales v. Asarese Matter Cmty. Ctr., 959 N.Y.S.2d 790, 792 (N.Y. App.

---

[14]  KI argues that, "[i]n a contract interpretation case, summary judgment is only available if the contract is unambiguous, and extrinsic evidence is not permitted in that interpretation." (Def.'s Mem. Supp. Opp'n Mot. Summ. J. 35.)  This is incorrect.  As noted above, if the extrinsic evidence is "so one-sided that no reasonable person could decide the contrary," the court may resolve the ambiguity as a matter of law.  3M Corp., 983 F.2d at 1183–84.

Div. 2013).

In the present case, the parties' own conduct in the filing of their Cross-motions makes it abundantly clear that legal resolution of the meaning and intent behind the Covenant Not to Compete is impossible based on review of the proffered extrinsic evidence.  In support of their two separate Motions for Summary Judgment, Statements of Fact, and Motions to Strike experts, the parties have collectively submitted over 900 pages of briefing.  Their evidentiary submissions include approximately fifty-six exhibits offered by KI and eight-four exhibits offered by ATD, totaling thousands of pages of documents.  Within their proposed Statements of Undisputed Facts, the parties each propose hundreds of allegations, each and every one of which has a specifically tailored response by the other party that is, more often than not, a denial of that alleged fact accompanied by citation to conflicting evidence.

A review of the voluminous evidence submitted by the parties on the discrete issue of the meaning of "Restricted Business" in the Covenant—*i.e.*, how the "Business" was conducted at the time of closing—clearly demonstrates that the intent of the parties remains a factual issue not appropriate for resolution on summary judgment.  For example, ATD offers multiple pieces of evidence suggesting that the intent behind the APA was the sale of "Catalog Division" of Adirondack and that, notwithstanding its name, the "Catalog Division" was engaged in furniture sales by any means whatsoever.  As noted above, Robert Charles, Esq., the attorney who negotiated the APA on behalf of KI and signed on behalf of Olympic Industries, stated:

> Q.    And to put it more generally, was it contemplated at the time that the catalog division was being sold?
>
> . . .
>
> A.    In layman's terms that phrase could have been used, yes.

37

> Q.     And was it contemplated that the catalog division would continue to function simply owned by ATD going forward?
>
> A.     Again, what ATD did with the assets—it was assumed largely because we had a supply agreement, we were hoping they would continue operations because the needed to buy product from KI.  So whether they used this computer or burned that table or did whatever, we don't know, but it was assumed that they would be operating a catalog—as a catalog company going forward probably using the assets that they paid KI money for or ADCO for.

(Charles Dep. 89:13–91:19.)  Randolph Mittasch, the Treasurer of the Adirondack Chair Co., Inc., who signed the APA on behalf of Adirondack, testified that the assets that were sold were the assets of the catalog division.  (Mittasch Dep. 134:14–19.)  Joseph Torre, Adirondack's Director of Operations at the time of the asset purchase, then explained that the term "Catalog" did not restrict Adirondack to sales by only catalogs and the Internet:

> A.     No, KI always classified it as catalog.  And we had all of the marketing functions under that and the sales functions, but they classified it as catalog and —
>
> Q.     Each and every—each and every marketing function that you had for purposes of marketing sales as opposed to rental, each and every marketing function was classified under the catalog division, right?
>
> A.     Yes.
>
> Q.     And each and every sales function you had was classified under the catalog division, right?
>
> A.     Correct.

(Torre Dep. 54:2–55:4.)  Finally, just four months prior to selling the assets, Adirondack indicated that the catalog division sold furniture "through direct mail marketing, outbound call center, outside sales, and the internet."  (Pl.'s Mot. Summ. J., Ex. G at ATD 11669.)

According to Plaintiff, as of January 31, 2008—the closing date of the APA—the catalog division of Adirondack marketed and sold furniture through numerous channels including

38

through mail order catalogs, over the phone, over the Internet on its website, via email and

through face-to-face meetings with customers.  (Mittasch Dep. 21:1–3, 22:16–25:23, 166:16–19.)

The call center was part of the catalog division.  (Id. at 16:12–18.)  Mr. Mittasch explained the

connection among these various forms of marketing as follows:

> Q. What I'm getting from you is that there is a synergistic relationship between the different ways you are touching customers; is that correct?
>
> . . .
>
> A. Yes.
>
> Q. So, you may send out a catalog, but you'll also have to call them; correct?
>
> . . .
>
> A. We don't have to, but—
>
> Q. But you did?
>
> A. Right, we did.  There were many ways.  You are ultimately trying to touch the customers any way possible.
>
> Q. Right, or go face-to-face with them?
>
> A. Uh-huh.
>
> Q. And all those types of ways that you touched a customer, if it's for selling the furniture, then it came out of the Adirondack catalog division?
>
> . . .
>
> A. Correct.

(Id. at 22:12–25:23.)  He went on to note that customers were not segregated into groups

according to the method used to solicit them.  (Id. at 153:9–25.)  Indeed, the catalog division's

marketing and sales operational plan included increasing web sales by migrating catalog

customers to order online and to expand a pro-active outside sales force.  (Pl.'s Mot. Summ. J.,

Ex. G at ATD11671.)  Given this evidence, ATD offers the plausible conclusion that

Adirondack's means of conducting its "Business" as of the closing of APA was the sale of

furniture and other office supplies through various means including catalogs, the Internet, call

centers, and an outside sales force.

KI, on the other hand, offers equally probative evidence that the APA did not involve the sale of any fictional "Catalog Division," but rather simply the assets utilized in Adirondack's catalog business. The Letter of Intent predating the executing of the APA stated that Adirondack was interested "in selling certain of its assets utilized in [Adirondack's] catalog division." (Pl.'s Mot. Summ. J., Ex. B.) Several witnesses clarified that what was intended to be sold was not a "catalog company," but rather the assets of a "catalog company." (Charles Dep. 42:18–43:13; Olsen Dep. 36:24–37:8; Mittasch Dep. 134:14–19.)

Moreover, KI presents substantial evidence that, as of January 31, 2008, Adirondack was almost purely a mail order catalog company. (Mittasch Dep. 23:16–24:5; Torre Dep. 49:23–50:4, 55:8–11, 89:10–18.) Inbound sales through the call center resulting from the mailing of catalogs constituted about 94% of sales, while outbound sales from outbound calling and face-to-face meetings would be around 4–6%. (Mittasch Dep. 185:10–187:4; Torre Dep. 87:9–88:4.) Only a small percentage of sales—less than 6%—came through the website. (Torre Dep. 85:13–86:87:8.) Moreover, KI offers evidence suggesting that, as of the time of the APA, Adirondack's "outside sales" model was no different than its catalog model. In other words, as testified to Mr. Mittasch, Adirondack's Outbound Call Center was directed at making calls to customers to whom it had already mailed catalogs; Adirondacks' efforts to use its Call Center to cold call prospects who were not existing customers had ended by the time of the APA:

> A.    So, they mailed out catalogs, you know, throughout the country, and then we
>        started, I believe in 2002 it was, an outbound call center that was like the
>        third piece. And they basically showed or called any of our old customers.
>        They were somewhat successful, not overly successful, but they—you know,

40

they kept the people coming back.  They would offer ten percent discounts, you know, they were able to, you know, help facilitate the sales.  And that department grew, shrank, you know, as time went on.

We did try cold calling for a time period.  This was in 2005.  That was not successful.  If a company didn't know of us and we just tried calling them, we found that to close the deal it was very difficult.  You needed like the foot in the door, basically, where they knew us, they ordered furniture from us, because that opened the door.

. . .

Q.      Did you ever stop the outbound calls for prospecting?

A.      Yes.

Q.      It was stopped?  When did it stop?

A.      We pretty much closed it down in 2006, a year later.

(Mittasch Dep. 15:7–17:23.)  Based on this evidence, KI offers the equally reasonable inference that Adirondack's catalog division—only the assets of which were sold to ATD—conducted its "Business" solely through making sales via catalogs and the Internet.

Likewise, the parties' evidence regarding the intent behind the Covenant Not to Compete reveal a highly fact-specific, credibility-based determination.  On one hand, ATD notes that the Covenant was negotiated in the interests of protecting ATD.  Janet Wischnia remarked that ATD "found out that [KI] owned Adirondack, and Adirondack was selling to end users.  And which is why during the course of the discussion we had talked—we wanted to negotiate the noncompete." (J. Wischnia Dep. 55:15–19.)  Ultimately, the Covenant was included to protect ATD's interests and as a material inducement to ATD entering into the APA.  (See APA §§ H.7, H.8(d).)  Further, according to ATD, the Covenant was necessary to necessitated by the Supply Agreement under which ATD committed to purchasing a certain amount of KI products over a certain number of years.  (Pl.'s Mot. Summ. J., Ex. O.)  ATD could not have agreed to these

41

minimum purchase commitments if it had to compete against KI for the same sales. Yet, ATD

claims that, at no time during negotiations of the Supply Agreement, did KI disclose that it was

selling products to end-user customers prior to and at the closing of the APA. Specifically, Eric

Wischnia, ATD Vice President and head of its furniture operations, testified as follows:

> Q.   Were you ever asked an opinion about the working of the Covenant Not to compete?
>
> A.   Yes.
>
> Q.   Before it was signed?
>
> A.   Before it was signed, yes.
>
> Q.   Can you tell me about that, what you were asked about?
>
> A.   I was asked about the general document. I read that. I know that I read the noncompete and I felt that it was solid, broad. It encompassed everything that we wanted it to encompass.
>
> . . .
>
> Q.   Are you aware as you sit here today of anyone from ATD at any time during the negotiations of those Agreements asking KI whether KI sold direct to end users?
>
> A.   Well, in effect, we knew that KI sold direct to end users through Adirondack.
>
> Q.   Okay. Are you aware of anyone asking KI whether they sold direct outside the scope of Adirondack?
>
> A.   No.
>
> Q.   So [a]s far as you know that didn't happen?
>
> A.   I believe I'm certain that it did not happen.

(E. Wischnia Dep. Day 1, 154:4–156:2.)

KI, however, again contends that the Covenant was not only for the benefit of ATD, since

KI received consideration from ATD for the Covenant in the amount of $10,000. (APA § C.2,

Exs. 1 & C.2.) According to KI, the parties agreed that this minimal sum, in the context of a $1.5

million dollar contract, was fair value for what KI was surrendering. (McIntyre Dep. 68:2–15.)

Had KI truly been giving up all sales to end-users, it claims that $10,000 would hardly be fair

compensation, thereby suggesting that the restriction on competition was not as broad as ATD

now claims it to be.  Moreover, KI asserts that the Covenant was clearly not necessitated by the

Supply Agreement.  It contends that if the purpose of the Covenant was truly to prohibit all end-

user sales by KI, then the Supply Agreement would have had to require ATD to make

significantly more than a mere $27 million in sales from KI over five years since KI had made

approximately $748 million in end-user sales between 2008–2012.  (Def.'s Mot. Summ. J., Exs.

6 & 42.)  Finally, several KI witnesses involved in the negotiations offered a very limited

interpretation of the Covenant.  Attorney Robert Charles testified that the Covenant Not to

Compete was:

> [I]ntended and worded to avoid the Olympic—KI and its subsidiaries were not going
> to be a catalog business anymore.  But as the agreement reflects, KI was not in the
> ADCO catalog business anyway nor was Olympic.  It was an indirect operation.  So
> when KI is agreement to this, it's not saying I won't compete indirectly or directly
> with the business.  It's saying—it's a structural question.  I'm not going to form
> another subsidiary.  I'm not going to do this as I did on the day before closing
> indirectly.

(Charles Dep. 115:18–116:4.)  Mark Olsen further explained that his understanding of

competition would be if "Adirondack would the next day go out and print up a bunch of catalogs

and begin to mail them to the general public to compete."  (Olsen Dep. 112:11–13.)

In short, the Court finds an obvious question of material fact that simply cannot be

resolved by review of the voluminous extrinsic evidence.  Both parties present ample probative

evidence to support their interpretation of the meaning and intent behind the Covenant Not

Compete.  What remains at this step is a matter of weighing the evidence and making credibility

determinations—tasks not appropriate for a court on summary judgment review.  Under New York law, where the language of the disputed contract is ambiguous and unable to be clarified by undisputed parole evidence, the Court is bound to deny summary judgment and submit the issue to a factfinder.[15]  Given the Covenant's obvious ambiguity and the literal piles of conflicting evidence as to the meaning of that Covenant, the Court declines to adopt either party's proposed contractual interpretation.

**B.**     **Whether the *Mohawk* Doctrine Makes Defendant's Competition with Plaintiff Unlawful**

In an alternative to interpretation of the contract at issue, Plaintiff alleges that, under New York's Mohawk doctrine, KI is precluded from soliciting customers of Adirondack as of the closing.  This argument fails on several grounds.

The Mohawk doctrine is based on a seller of goodwill's permanent implied covenant or

---

[15]  Defendant argues that Plaintiff's interpretation of the Covenant is unenforceable because it would produce an "absurd" result.  Under New York law, courts can reject an absurd construction in favor of one which would better accord with the reasonable expectations of the parties.  Reape v. N.Y. News, Inc., 504 N.Y.S.2d 469, 470 (N.Y. App. Div. 1986).  In addition,

> parties to an agreement are presumed to act sensibly . . . and an interpretation that produces an absurdly harsh result is to be avoided . . . Since there exists, in every contract, an implied covenant of good faith and fair dealing, the courts may take into consideration the fact that one construction would make the contract unreasonable. Thus, courts will endeavor to give the construction most equitable to both parties instead of one which will give one of the parties an unfair or unreasonable advantage over the other.

Matter of Friedman, 407 N.Y.S.2d 999, 1006 (N.Y. App. Div. 1978) (internal citations and internal quotation marks omitted]).  Given that the parties' intent and the impact of their various interpretations on their respective businesses remains an issue of fact, the Court declines to address this issue at this time.  Defendant may re-raise the issue at trial before a factfinder who will be instructed on this law.

"duty to refrain from soliciting former customers, which arises upon the sale of the 'good will' of an established business." Bessemer Trust Co., N.A. v. Branin, 949 N.E.2d 462, 468 (N.Y. 2011) (quoting Mohawk Maint. Co. v. Kessler, 419 N.E.2d 324 (N.Y. 1981)).  This "covenant," which is effective in perpetuity, is based on the principle that "the vendor is not at liberty to destroy or depreciate the thing which he has sold; there is an implied covenant, on the sale of [']goodwill['], that the vendor does not solicit the custom which he has parted with; it would be a fraud on the contract to do so."  Id. (quoting Von Bremen v. Mac Monnies, 200 N.Y. 41, 50–51 (1910)). Thus, the seller of "goodwill" may not "actively solicit" the customers associated with it.  Id.

Nonetheless, a buyer of "goodwill" still assumes "certain risks" in relation to the continuation of the purchased business.  Id.  Absent a contractually binding promise not to compete, the buyer still risks loss of customers.  Id.  The New York Court of Appeals has not created a "hard and fast rule [to] determin[e] whether a seller of 'good will' has improperly solicited his former clients," but has instructed that the trier of fact must consider the principles underlying the rule in Mohawk and the factors involved within the relevant industry that may impair the "good will" conveyed by the original seller.  Bessemer Trust Co., N.A. v. Branin, 675 F.3d 130, 134 (2d Cir. 2012).  Among the factors to be considered are whether the seller initiated contact with his or her former clients associated with the sold "good will," such as by sending targeting mailings or making individualized phone calls.  Id.

The Court, however, need not consider the implications of this doctrine any further.  By its express admission, Plaintiff has never pled or otherwise raised this theory prior to its Motion for Summary Judgment.  (Pl.'s Mem. Supp. Mot. Summ. J. 8 n.3.)  The pleading requirements of the Federal Rules of Civil Procedure are designed to provide defendants "fair notice of what the

45

plaintiff's claim is and the grounds upon which it rests."  Conley v. Gibson, 355 U.S. 41, 47 (1957).  "Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that 'it is inappropriate to raise new claims for the first time in submissions in [motions for or] opposition to summary judgment.'"  Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407–08 (S.D.N.Y. 2000) (quoting Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 170 F.R.D. 111, 119 (S.D.N.Y.1997) and citing Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp., 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997) ("[Plaintiff] in effect is apparently attempting to add a claim never addressed, or even hinted at, in the complaint.  Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a motion."); Harvey v. New York City Police Dep't, No. Civ.A.93-7563, 1997 WL 292112, at *2 n.2 (S.D.N.Y. June 3, 1997); Allen v. West Point–Pepperell, Inc., 908 F. Supp. 1209, 1224 (S.D.N.Y. 1995); Coppola v. Connecticut Student Loan Found., No. Civ.A.87-398, 1989 WL 47419, at *3 n.14 (D. Conn. Mar. 2, 1989)).  "[I]t is basic that to plausibly allege a cause of action arising under a statute or other legal ground relied upon by a party asserting such claim . . . such claim fails to do so if 'as a matter of law' under no arguable construction of the legal ground relied on in the pleading."  Mar-Cone Appliance Parts Co. v. Mangan, 879 F. Supp. 2d 344, 372–73 (W.D.N.Y. 2012).

    As aptly noted by Defendant, despite the fact that this litigation was initiation in January 2012, Plaintiff never mentioned the Mohawk doctrine until May 2013—approximately a year and a half later—when it filed its Motion for Summary Judgment.  Having filed three separate Complaints in this action, none of which even hinted at the invocation of this doctrine, Plaintiff

has failed to put Defendant on notice that it intended to rely on this doctrine.  This failure is even more egregious in light of the fact that Defendant twice successfully moved to dismiss claims from Plaintiff's Complaints during the Rule 12(b)(6) phase of this litigation.  Without previous notice of the <u>Mohawk</u> doctrine claim, Defendant was deprived of a similar opportunity to test this theory's viability.  Likewise, Defendant was prevented from taking any discovery on the unique issues raised by the <u>Mohawk</u> doctrine—specifically, whether there was any improper "solicitation," as opposed to competition, as defined under New York law.

Plaintiff now argues that because the <u>Mohawk</u> doctrine is an implied covenant, it need not be pled separately under New York law, but rather is encompassed by the breach of contract claim.  The cases cited by Plaintiff in support of that proposition, however, are inapposite.  In <u>First Am. Int'l Bank. v. Community's Bank</u>, 771 F. Supp. 2d 276 (S.D.N.Y. 2011), the court considered, on a Rule 12(b)(6) motion, whether a claimed breach of the implied covenant of good faith and fair dealing was adequately pled by virtue of the complaint's general allegation of breach of contract.  <u>Id.</u> at 282–83.  The court held that because, in New York, all contracts imply a covenant of good faith and fair dealing in the course of performance, an alleged breach of the implied covenant of good faith and fair dealing is part of a general breach of contract claim and need not be separately pled.  <u>Id.</u>  Indeed, under New York law, it is well-settled that a claim for breach of an implied covenant of good faith and fair dealing does not provide a cause of action separate from a breach of contract claim and is, in fact, duplicative of a breach of contract action.  <u>Dorset Indus., Inc. v. Unified Grocers, Inc.</u>, 893 F. Supp. 2d 395, 405 (E.D.N.Y. 2012).

By contrast, it is well-settled that the <u>Mohawk</u> Doctrine arises from a duty imposed by

law and sounding entirely in tort—it is not part of a contract claim.[16]  Mar-Cone,  879 F. Supp.

2d at 369.  "The duty not to solicit former clients arising from the sale of goodwill is distinct

from the duty not to compete in the industry, which may only arise out of an express agreement."

USI Ins. Servs., LLC v. Miner, 801 F. Supp. 2d 175, 191 (S.D.N.Y. 2011) (citing Mohawk, 419

N.E.2d at 324).  The Court of Appeals clarified that distinction by noting that "absent an express

or restrictive covenant not to compete," advertising to the general public or competition in the

same industry should not be considered solicitation for purposes of the doctrine, so long as such

advertisements or solicitations are not specifically aimed at the seller's former clients.  Bessemer

Trust Co., 949 N.E.2d at 469–70.  Indeed, even absent an express or implied contract, a claim

under the Mohawk doctrine has been allowed to proceed.  Bessemer Trust Co., 618 F.3d at 87

n.2.  As such, quite unlike the breach of the implied covenant of good faith and fair dealing, the

Mohawk doctrine could not possibly be implied in or invoked by a general breach of contract

claim.[17]  This is particularly true given that the Covenant Not to Compete at issue here

--------

[16]  In its Reply Brief, Plaintiff makes much of the fact that New York does not recognize an implied covenant as a separate cause of action, thereby making part of a general breach of contract.  Notably, however, in Mohawk, the New York Court of Appeals expressly recognized that " . . . it may be somewhat misleading to describe the duty of the seller [of a business's good will] to refrain from soliciting his former customers as one emanating from 'an implied covenant,' since the duty is, in reality, one imposed by law, in order to prevent the seller from taking back that which he has purported to sell."  Mohawk, 419 N.E.2d at 329.

[17]  Plaintiff's reliance on Borne Chem. Co. v. Dictrow, 445 N.Y.S.2d 406 (N.Y. App. Div. 1981) is confusing at best.  In that case, the plaintiff presented three causes of action, two of which were a breach of contract action and an unfair competition and unfair business practices action.  Id. at 647.  Following the trial court's dismissal of all claims, the appellate court reinstated the cause of action for breach of the covenant not to compete.  It noted that "[i]mplicit in the sale of a business, unless expressly reserved, is the sale of its 'good will.'  Consequently, the seller of a business will not be permitted to undermine that good will by soliciting his former customers."  Id.  Plaintiff now argues that because the Appellate Court directed consideration of the Mohawk doctrine when the only remaining cause of action concerned a breach of contract, a

specifically prohibits "competition," while the Mohawk doctrine places a much narrower restriction on only solicitations.  Having failed ever plead this cause of action previously in the year-and-a-half since initiation of this action, the Court must decline to consider it at this late juncture of the litigation.[18]

Beyond Plaintiff's failure to adequately plead a cause of action under the Mohawk doctrine, the Court questions whether such a claim would even be actionable in this litigation. The Mohawk doctrine is a tort theory arising strictly under New York law, with no corollary under Pennsylvania law.  As this Court previously recognized when ruling on Defendant's Motion to Dismiss:

> The Asset Purchase Agreement states that "This Agreement and the legal relations among the Parties shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in New York.'" (Asset Purchase Agreement § I ¶ 5.)  The Supply Agreement states that "This Agreement and any disputes hereunder shall be governed by and construed in accordance with the internal laws of the State of Illinois." (Supply Agreement ¶ 14.) Choice of law provisions such as these, however, "do not govern tort claims between contracting parties unless the fair import of the provision embraces all aspects of the

---

claim for breach of a covenant not to compete is sufficient pleading for a Mohawk claim.
Nothing in Borne, however, even remotely suggests that a Mohawk covenant not to solicit is implied in a breach of contract.  Indeed, far unlike Plaintiff here, the plaintiff in Borne had originally brought a tort claim, which, although dismissed by the trial court, had adequately put the defendant on notice of the claim.  Moreover, Borne was decided prior to the most recent jurisprudence expressly finding that a Mohawk covenant is implied in law and thus sounds in tort, meaning that it is not implied into a private contractual relationship.  Accordingly, the Court deems Borne inapposite.

[18]  Plaintiff does not seek leave to amend and this Court would not be inclined to grant such leave at this point.  As noted, the case has proceeded through several complaints, two rounds of motions to dismiss, full discovery, and extensive summary judgment briefing. Undoubtedly, allowing Plaintiff to again amend its Complaint to assert this new tort cause of action—particularly absent any showing of why Plaintiff could not have asserted it earlier—would result in great prejudice to both Defendant and notions of judicial economy.

legal relationship." Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc., 848 F. Supp. 569, 576 (E.D. Pa. 1994). Defendant contends, and Plaintiff does not dispute, that the choice of law provisions in this case pertain only to the contractual relationships between the parties, and that Plaintiff's tort claims should therefore be analyzed under the laws of the forum. (Def.'s Mem. 15-18.)

ATD-Am Co. v. Krueger Int'l, Inc., No. Civ.A.12–0032, 2012 WL 1382472, at *7 n.4 (E.D. Pa. Apr. 20, 2012). As Plaintiff has yet to offer a reason why New York law should apply to any tort claims between these parties, the Court must apply the law of Pennsylvania—our forum state—to such claims. See Erie R. Co. v. Tompkins, 304 U.S. 64, 79–80 (1938) (holding that when a federal court acquires jurisdiction via diversity, the substantive law of the forum state is to be applied). Because Pennsylvania law does not provide for any covenant implied in law regarding a duty of non-solicitation, similar to the Mohawk doctrine, Plaintiff's ability to rely on such a theory stands on tenuous grounds.

Thus, notwithstanding Plaintiff's vigorous arguments for relief under the Mohawk doctrine, the Court declines to consider them. Plaintiff never pled this theory in any iteration of its Complaint. Moreover, Plaintiff never sought leave to amend its Complaint at any time during discovery to add in such a theory. Indeed, Plaintiff waited until it filed its own Motion for Summary Judgment to seek relief under this entirely new theory leaving Defendant with no opportunity to test the viability of such a theory during discovery. Given this undue delay and resulting prejudice and in light of the fact that Plaintiff's ability to even assert this theory in this Court is questionable, the Court shall deny Plaintiff's Motion for Summary Judgment on this ground.

50

C.      **Severability of the Covenant Not to Compete**

In the event of a finding of contractual ambiguity, Defendant also offers an alternative argument in support of its Motion for Summary Judgment—severability.  Specifically, Defendant contends that both parties' interpretations of the Covenant Not to Compete are reasonable and that, when negotiating this Covenant, they failed to reach a mutual understanding of what competition was prohibited.  In that respect, there was no meeting of the minds, which, under New York law, compels a finding that no contract regarding the Covenant Not to Compete was ever formed.  Defendant goes on to note that the APA contains a severability clause allowing an invalid or unenforceable provision to be severed from the Agreement in order to maintain the enforceability of the remaining contract.  As such, Defendant reasons that the Court should sever the Covenant Not to Compete and simply require KI to return the $10,000 at which the parties valued that Covenant.

Under New York law, there must be an "objective meeting of the minds" to establish an enforceable contract.  Express Indus. and Terminal Corp. v. N.Y. State Dep't of Transp., 715 N.E.2d 1050, 1053 (N.Y. 1999).  "In order for a breach of contract to exist, there must be a meeting of the minds for the agreement said to have been breached."  Miranco Contracting, Inc. v. Perel, 816 N.Y.S.2d 516, 516–17 (N.Y. App. Div. 2006) (citations omitted).  A "mere agreement to agree, in which a material is left for future negotiations, is unenforceable."  Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 417 N.E.2d 541 (N.Y. 1981).   A contract is unenforceable where there is no meeting of the minds between the parties regarding a material element thereof.  Brands v. Urban, 587 N.Y.S.2d 698, 700 (N.Y. App. Div. 1992); see also Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC, 760 F. Supp. 2d 384, 398

51

(S.D.N.Y. 2011) ("When the parties understand the relevant language differently and both understandings are reasonable, however, the contract will be unenforceable as no meeting of the minds has occurred.").

Nonetheless, it remains established that "[n]ot every misunderstanding between the parties following execution of an agreement could possibly void a contract, since almost any contractual dispute is based on some disappointment of expectations." Canada Life Assur. Co. v. Guardian Life Ins. Co. of Am., 242 F. Supp. 2d 344, 356 (S.D.N.Y. 2003). "Rather, it is only where no sensible ground exists for choosing between conflicting understandings of the contractual language, and where the parties agree to terms that reasonably appear on their face to each of them to be unequivocal but in fact are not . . . that a voiding of the contract is necessary." Id. (footnote omitted). Thus, the question becomes whether the agreement at issue "presents a fundamental misunderstanding on a term that is so ambiguous that a court should . . . declare the contract void, or, on the other hand, whether the issue presented as to contract formation is sufficiently unambiguous that [a factfinder] may resolve any differences that exist concerning the terms through contract interpretation." Id. at 357.

In the present case, Defendant's severability argument is premature since the Court finds that a factfinder may have a sensible basis for choosing between the two conflicting understandings as to the Covenant Not to Compete. As a primary matter, there is little doubt that, when drafting the APA as a whole, the parties reached some "meeting of the minds" as to most, if not all, of the essential terms. KI's corporate designee, Mr. Charles, explained that the final agreement was a product of back and forth negotiation and was mutually drafted by both parties. (Charles Dep. 28:19–29:8.) As such, the sole ambiguity calls into question the meaning

of the Covenant Not to Compete.

As noted above, this Court has found that the language of the Covenant is ambiguous requiring resort to extrinsic evidence to determine the parties' intent—specifically, what was meant by the "Restricted Business."  The parties, however, have presented thousands of pages of evidentiary exhibits, a large portion of which are directed towards establishing what each party deems the proper and reasonable interpretation of the Covenant Not to Compete.  The mere fact that the parties' exhibits urge different interpretations of the Covenant does not clearly establish an absence of a meeting of the minds.  Indeed, as noted by Plaintiff, the parties engaged in extensive due diligence, including a visit by ATD to the Adirondack offices in Long Island to "help [ATD] understand [Adirondack's] business better.  (Pl.'s Mot Summ. J., Ex. J; see also J. Wischnia Dep. 42:8–54:4.)  It is entirely plausible that, at the time of the signing of the APA, the parties fully understood and acknowledged the meaning of the term "Restricted Business" and thus had a meeting of the minds regarding the intent and purpose behind the Covenant, but that in practice, one of the party's expectations were not met by the mutually drafted agreement.  The disappointed party then opted to exploit the ambiguity in the contract to offer an alternative, albeit not originally agreed-upon interpretation, in order to make the Contract work more favorably to its interests.  By the same token, it is equally plausible that the parties never fully understood Adirondack's "Business as conducted," were not fully cognizant of each other's business practices, and never clearly agreed on the scope of the Covenant Not to Compete.  This determination, however, is a matter of credibility that simply cannot be resolved by a Court on summary judgment review.  Ultimately, a factfinder may find a "sensible ground . . . for choosing between conflicting understandings of the contractual language," in which case the Covenant

may be properly interpreted and the parties held to its terms.  Canada Life Assur., 242 F. Supp. 2d at 356.

Nor is this Court convinced by the cases cited by Defendant in support of its argument. First, in International Paper Co. v. Suwyn, 966 F. Supp. 246, 254 (S.D.N.Y. 1997), the defendant was an executive with the plaintiff company and reluctantly signed a non-compete agreement, agreeing not to work for a competitor for eighteen months were he to leave the plaintiff's employ.  Id. at 251.  During discussions, the plaintiff assured the defendant that the agreement would not be construed to bar him from going to a number of companies that, although direct competitors, competed only in those areas where the plaintiff was a "niche" player; rather he would be barred from working for those companies in the "imaging business" that competed directly with the plaintiff.  Id.  These discussions were significant because the defendant was now reassured that his job possibilities, should he leave, were not as limited as spelled out in the written agreement, but were instead consistent with his discussions with the plaintiff.  Id.  The next day, the defendant prepared a "side letter" confirming his understanding of the non-compete agreement based on the parties' discussions, together with a signed copy of the agreement.  Id. at 252.  The plaintiff believed that the "side letter" had no legal significance and merely "captured the spirit" of the prior discussion as to how the non-compete would be enforced.  Id.  After review by plaintiff, the defendant executed a copy of the agreement with the side letter attached. Eventually, the defendant left the company for another employer that was primarily a building material producer, and the plaintiff filed suit for breach of the non-compete agreement.  Id.

Following a non-jury trial, the court determined that the side letter was actually a

counteroffer and that plaintiff's signature on the non-compete agreement constituted an acceptance of that counteroffer.  Id. at 254.  It then found that this counteroffer was ambiguous and that the meanings each party attached to the terms in that contract were reasonable.  Id. at 255.  Crucially, the court then determined that, based on the testimony from both sides, the term "major paper company" was differently understood by the parties.  Id.  In view of the different, but reasonable understandings of the key language, the court found no enforceable agreement.  Id.  Thus, the court denied injunctive relief and dismissed the breach of contract claim.  Id. at 256.

This case is unhelpful for several reasons.  First and foremost, International Paper was decided following a non-jury trial, meaning that the court was able to make credibility findings following the presentation of live testimony and documents.  As the present case is only at the summary judgment stage, this Court does not have the liberty to decide factual issues in the face of conflicting evidence.  Thus, a legal ruling as to whether the parties had a meeting of the minds is neither proper nor possible.  Second, the court in International Paper found that the differing understandings concerned the key term, "major paper company"—a term that was ambiguous on its face and could not be resolved by resort to extrinsic evidence.  In this case, the ambiguity arises with respect to the term "Restricted Business," which, by the explicitly agreed-upon terms of the Covenant, requires consideration of extrinsic evidence regarding how Adirondack conducted business at the time of the closing of the APA.  Because the parties present conflicting evidence as to Adirondack's operations at the time of closing, the Court has found that the issue is one of fact.  Such disputed facts, however, do not necessarily equate to a lack of meeting of the minds as to what the Covenant was intended to restrict.

The same holds true for Defendant's reliance on <u>Gessin Electrical Contractors, Inc. v. 95 Wall Assoc., LLC</u>, 903 N.Y.S.2d 26 (N.Y. App. Div. 2010).  In <u>Gessin</u>, the plaintiff, a contractor on a construction project, had submitted to defendant, the premises owner, changes orders in the amount of $1.7 million, over which a dispute arose.  <u>Id.</u> at 517.  The defendant agreed to resolve the dispute by paying the plaintiff $500,000.  <u>Id.</u>  The defendant, however, did not realize that about $1.09 million of the plaintiff's claim had already been satisfied by payments from the general contractor.  <u>Id.</u>  Thus, the defendant thought it was settling the full $1.7 million claim for $500,000, whereas the plaintiff thought it was settling a $580,000 balance for $500,000.  <u>Id.</u>  After the oral agreement was reached, the defendant's counsel drafted a one-page agreement that provided for the $500,000 payment to be paid and stated that "Owner and Contractor agree to value all change orders and extras . . . arising from the date of the inception of the Contract at hte sum of $500,000."  <u>Id.</u>  After the defendant paid the first $450,000 due, it realized that it had already paid $1 million for change orders through the general contractor and took the position that the plaintiff had been overpaid.  <u>Id.</u>  On summary judgment proceedings, the court found the agreement to be ambiguous and to not reflect either party's understanding.  <u>Id.</u>  It further found that both party's interpretations would result in unjust enrichment of the other party and that neither party would have entered into the agreement if they were aware of what the other side thought the settlement agreement contained.  <u>Id.</u> at 520.  Accordingly, it rescinded the contract, thus restoring the status <i>quo ante</i>, where the defendant had already paid the plaintiff on some of its claims and left the remaining claims outstanding.  <u>Id.</u>

<u>Gessin</u> is unpersuasive.  First, although the court in that case used the language of ambiguity, the facts suggest that the differing interpretations resulted from a mutual mistake of

fact—*i.e.*, defendant was unaware that the general contractor had paid for some of the change orders while plaintiff believed that defendant knew that fact and was settling the balance for $500,000.  The present case is not premised on a similar mutual mistake of fact, but rather an ambiguity as to what was meant by "Restricted Business."  As repeatedly set forth above, that ambiguity may be easily resolved upon a factfinder's consideration of all evidence of record.  Second, Gessin found that rescission of the settlement agreement allowed for restoration of the status *quo ante*, since the parties simply had to re-negotiate a settlement of the outstanding claims.  In this case, granting Defendant's suggested remedy of severance of the Covenant Not to Compete will benefit Defendant, as it will free Defendant of any restrictions on its ability to sell to end-users for the relatively small sum of $10,000,[19] but will leave Plaintiff in the precarious position of having purchased the assets of Adirondack's catalog business, being obligated to make a minimum number of purchases from KI, but having to compete with KI in all means of sales of those products.  Certainly, this is not the result intended by either party and is contrary to KI's own admission that the Covenant contained restrictions.  (Def.'s Mem. Supp. Mot. Summ. J. 8.)

In short, the Court declines to grant summary judgment as to Defendant's requested remedy of severing the Covenant Not to Compete from the rest of the APA.  The APA's severability clause states that severance of a provision can occur, "[i]f any term, condition or provision of this Agreement shall be declared invalid or unenforceable."  (APA § I.12.)  At this

---

[19]  Notably, although Defendant contends that the APA explicitly values the Covenant Not to Compete at $10,000, Plaintiff asserts that this valuation was for tax purposes only and does not represented the isolated value of the Covenant.

juncture of the litigation, the Court cannot, as a matter of law, declare the Covenant Not to Compete invalid or unenforceable.  Indeed, throughout the majority of its brief, KI vigorously asserts that "the Covenant language has a reasonable interpretation."  (Def.'s Mem. Supp. Mot. Summ. J. 8.)  The next step is for a fact-finder to determine whether a singular reasonable interpretation is possible and, if so, what exactly that interpretation is.

IV.     CONCLUSION

Having reached an impasse as to the meaning of the Covenant Not to Compete at issue the Court must end the analysis at this point.  Absent a clear interpretation of the Covenant, the Court cannot consider whether or not it was breached.  In turn, absent a finding of breach, the Court has no reason to consider either whether Plaintiff has adequately proven damages[20] or whether Plaintiff is entitled to an injunction.  Accordingly, the Court shall deny both Motions for Summary Judgment and shall schedule a mutually agreeable date for trial.

An appropriate Order follows.

---

[20] Defendant has incorporated into its Motion for Summary Judgment a Motion to Preclude Plaintiff's damages expert, Paul Pacalyko.  As the Court is not reaching the issue of damages in this Opinion, it would be premature to opine on the merits of this Daubert motion. Accordingly, it will be dismissed without prejudice to Defendant's right to renew it prior to trial via a properly-filed Motion in Limine.